# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### Western Division – Cincinnati



| | | |
|---|---|---|
| UNITED STATES OF AMERICA;<br>STATE OF INDIANA;<br>*ex rel.* CATHY OWSLEY,<br><br>Plaintiffs,<br><br><br>v.<br><br><br>FAZZI ASSOCIATES, INC.;<br>CARE CONNECTION OF CINCINNATI;<br>GEM CITY HOME CARE;<br>ASCENSION HEALTH CARE;<br>ENVISION HEALTHCARE HOLDINGS, INC.<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | **FILED UNDER SEAL<br>PURSUANT TO<br>31 U.S.C. § 3730(b)(2)**<br><br>1:15CV511<br><br>J. BECKWITH<br><br>M.J. BOWMAN |

---

## *QUI TAM* COMPLAINT

---

This is an action brought by Plaintiff/Relator Cathy Owsley on behalf of the United States of America pursuant to the False Claims Act, 31 U.S.C. § 3729, *et seq.* (the "FCA"), and the State of Indiana pursuant to the Indiana False Claims and Whistleblower Protection Act, 5-11-5.5, *et seq* (as amended through P.L. 109-2014). In support thereof, Relator alleges as follows:

    1.    From at least December 2014 through the present, Fazzi Associates, Inc. and Envision Healthcare Holdings, through its subsidiaries, Care Connection of Cincinnati, and Gem City Home Care and partner Ascension Health Care, have engaged in a scheme to defraud the United States and the State of Indiana by knowingly submitting and/or causing to be submitted

false and/or fraudulent claims, and retaining overpayments from Government Payors. Defendants knowingly billed government healthcare programs, including Medicare, Medicaid, CHAMPUS/TRICARE, for services which were not performed as claimed.

2. In addition, in some cases, these falsified diagnoses have caused unnecessary procedures to be performed on patients, raising the concern that Defendants' fraudulent conduct is compromising patient safety.

3. The FCA provides that any person who knowingly submits or causes to be submitted to the government or recipients of federal funds a false or fraudulent claim for payment or approval is liable for a civil penalty of between $5,500 and $11,000 for each such claim, and three times the amount of the damages sustained by the government. The FCA permits persons having information regarding a false or fraudulent claim against the government to bring an action on behalf of the government and to share in any recovery. The complaint must be filed under seal, without service on the defendant. The complaint remains under seal while the government conducts an investigation of the allegations in the complaint and determines whether to join the action.

4. Pursuant to the FCA, plaintiff/relator seeks to recover on behalf of the United States and the State of Indiana, damages and civil penalties arising from Defendants' overcharging of Medicare, Medicaid, and CHAMPUS/TRICARE by: (1) falsifying diagnoses to justify higher reimbursement rates through fraudulent upcoding; (2) billing for services not rendered or medically unnecessary; and (3) retaining known overpayments.

**PARTIES**

5. Relator Cathy Owsley is a resident of Ft. Thomas, Kentucky. She has been a registered nurse for nearly forty years, and has sixteen (16) years of nursing home experience.

2

Since 2006, she has worked as a Quality Assurance Nurse for Care Connection of Cincinnati. She is responsible for reviewing patient assessment forms and completing Plans of Care that are initiated by the assessing clinician and must be signed by a physician. In addition, in this capacity, she has firsthand knowledge of how Care Connection of Cincinnati bills Government Payors based on the Plans of Care she reviews.

6.     Defendant Fazzi Associates, Inc. ("Fazzi") is located in Northampton, Massachusetts and specializes in the coding of home care and hospice medical services. Fazzi is the largest outsource coding service in the country with annual revenue of $5.4 million.

7.     Defendant Care Connections of Cincinnati ("CCC") is a home health agency located in Cincinnati, Ohio. Its parent company is Evolution Health Care of Dallas, Texas. CCC has a normal census of 1500 patients, more than 60% of whom are insured by government health care plans.

8.     Defendant Gem City Home Care ("Gem City") is a home health agency with locations in Dayton, Ohio, Columbus, Ohio and Indianapolis, Indiana. Its parent company is Evolution Health, a division of Defendant Envision Healthcare Holdings, Inc. Together, CCC and Gem City provide home nursing services to 53 counties in Ohio and Indiana.

9.     Defendant Envision Healthcare Holdings, Inc. ("Envision"), formerly Emergency Medical Services Corporation, was formed in January 2005. It provides a broad range of healthcare solutions, ranging from medical transportation to hospital encounters to comprehensive care alternatives. Envision Healthcare issued an initial public offering in late 2005, and on that date, merged with a leading private equity firm. In 2012, Envision created a division called Evolution Health, which is a healthcare services provider specializing in post-acute care management of patients with advanced illnesses and chronic disease with annual

revenues of $4 billion. Evolution Health is headquartered in Dallas, Texas, with more than 1,100 employees, managing a daily census of over 11,000 patients. Envision will hereinafter be referred to as "Evolution Health."

10. Defendant Ascension Health is a faith-based healthcare organization and is a direct subsidiary of Ascension, the largest non-profit health system in the United States. It is headquartered in Edmundson, Missouri. In September 2014, Ascension Health and Evolution Health entered a joint venture agreement to provide home health care services. Pursuant to this agreement, Evolution Health is Ascension Health's "exclusive partner" in the provision of home health care services. Both parties to the agreement anticipate annual revenues to be between $75 and $100 million.

## JURISDICTION AND VENUE

11. This action arises under the Federal False Claims Act, 31 U.S.C. §§ 3729-3732, and the Indiana False Claims and Whistleblower Protection Act, IC 5-11-5.5. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 1345, 28 U.S.C. § 1367 and 31 U.S.C. § 3732(a), which specifically confers jurisdiction on this Court for actions brought under 31 U.S.C. § 3730. Additionally, 31 U.S.C. § 3732(b) specifically confers jurisdiction on this Court for state-law claims that arise under the same transactions or occurrences as the action brought under 31 U.S.C. § 3730.

12. This Court has personal jurisdiction over Defendants pursuant to 31 U.S.C. § 3732(a), which authorizes nationwide service of process, because Defendant Fazzi Associates, Inc. can be found in, resides in, transacts business in and/or has committed the alleged acts in Boston, Massachusetts, which is in the District of Massachusetts.

13.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)-(c) and 31 U.S.C.

§ 3732(a) because Defendant Fazzi Associates, Inc. can be found in, resides in, or has transacted

business in the District of Massachusetts, and many of the alleged acts occurred in this District.

14.     Relator is an original source as defined by the False Claims Act in 31 U.S.C. §

3730(e)(4)(B). Relator has made voluntary disclosures to the United States and the State of

Indiana prior to the filing of this lawsuit as required by 31 U.S.C. § 3730(b)(2).

## REGULATORY OVERVIEW

### The Federal and State False Claims Acts

15.     The False Claims Act, as amended by the Fraud Enforcement and Recovery Act

of 2009, Pub. L. No. 111-21[1] provides, in relevant part:

> **Liability for Certain Acts.** (1) **In General** – Subject to paragraph (2), any person who –
> (A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or
> approval; (B) knowingly makes, uses, or causes to be made or used, a false record or statement
> material to a false or fraudulent claim; . . . or (G) knowingly makes, uses, or causes to be made
> or used a false record or statement material to an obligation to pay or transmit money or property
> to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an
> obligation to pay or transmit money or property to the Government, is liable to the United States
> for a civil penalty of not less than [$5,500] and not more than [$11,000] . . . plus 3 times the
> amount of damages which the Government sustains because of the act of that person.
>
> 31 U.S.C. § 3729(a)(1).
>
> **Actions by Private Persons.** (1) A person may bring a civil action for a violation of
> section 3729 for the person and for the United States Government. The action shall be brought in
> the name of the Government.
>
> 31 U.S.C. § 3730(b)(1).

16.     Additionally, the State of Indiana has passed False Claims Act legislation which

closely mirrors the Federal FCA.  Defendants' acts alleged herein constitute a violation of the

Indiana False Claims and Whistleblower Protection Act, IC 5-11-5.5.

---

[1] The FCA was further amended on March 23, 2010 by the Patient Protection and Affordable Care Act ("PPACA"),
Pub. L. 111-148, 124 Stat. 119. PPACA did not impact the portions of the FCA quoted here.

17.     Relator seeks to recover damages and civil penalties in the name of the United States of America and the State of Indiana arising from the false statements and claims for payment made by Defendants to the United States and the State of Indiana.  Specifically, the false statements and claims involve "upcoding" home health prospective payment data by fraudulently manipulating and altering patient diagnoses in order to inflate prospective payments.

**Duty to Report and Return Overpayments**

18.     The Medicare and Medicaid program integrity provisions, 42 U.S.C. § 1320a-7k(d), state as follows:

**(d) Reporting and returning of overpayments**

**(1) In general**

If a person has received an overpayment, that person shall--

(A)     Report and return the overpayment to the Secretary, the State, an intermediary, a carrier, a contractor, as appropriate, at the correct address; and

(B)     Notify the Secretary, State, intermediary, carrier, or contractor to whom the overpayment was returned in writing of the reason for the overpayment.

**(2) Deadline for reporting and returning overpayments**

An overpayment must be reported and returned under paragraph (1) by the later of—

(A)     The date which is 60 days after the date on which the overpayment was identified; or

(B)     The date any corresponding cost report is due, if applicable.

**(3) Enforcement**

Any overpayment retained by a person after the deadline for reporting and returning the overpayment under paragraph (2) is an obligation (as defined in section 3729(b)(3) of Title 31) for purposes of section 3729 of such title.

## GOVERNMENT HEALTHCARE PROGRAMS

19.     The Medicare Program ("Medicare") is a Health Insurance Program administered by the Government of the United States that is funded by taxpayer revenue. Medicare is directed by the United States Health and Human Services Department ("HHS"). Medicare was designed to assist participating states in providing medical services and durable medical equipment to persons over sixty-five (65) years of age and certain others who qualify for Medicare.

20.     The Medicaid Program ("Medicaid") is a Health Insurance Program administered by the Government of the United States that is funded by State and Federal taxpayer revenue. It is overseen by HHS. Medicaid was designed to assist participating states in providing medical services, durable medical equipment and prescription drugs to financially-needy individuals who qualify for Medicaid.

21.     CHAMPUS/TRICARE is a federally-funded program that provides medical benefits to (a) the spouses and unmarried children of (1) active duty and retired service members and (2) reservist who were ordered to active duty for thirty days or longer; (b) the unmarried spouses and children of deceases service members; and retirees.

22.     Whenever appropriate, Medicare, Medicaid and CHAMPUS/TRICARE will be collectively referred to as "Government Payors."

## MEDICARE AND MEDICAID HOME HEALTH COVERAGE

23.     Through the Medicare program administered by Center for Medicare and Medicaid Services ("CMS"), the United States provides health insurance to eligible citizens. *See*

42 U.S.C. §§ 1395, et. seq. As part of its coverage, Medicare pays for some "home health services" for qualified patients. In order to qualify for home health care reimbursement under Medicare, a patient must: (1) be homebound – i.e., the patient is generally confined to her home and can leave only by dent of considerable effort; (2) need part-time skilled nursing services or speech therapy, physical therapy, or continuing occupational therapy as determined by a physician; and (3) be under a plan of care ("Plan of Care") established and periodically reviewed by a physician and administered by a qualified home health agency (HHA). *See* 42 U.S.C. 1395(f). When a patient so qualifies, Government Payors will pay for: (1) part-time skilled nursing care; (2) physical, occupational, or speech therapy; (3) medical social services (counseling); (4) part-time home health aide services; and (5) medical equipment and supplies. *Id.*

24.     Government healthcare programs pay for home health care by way of a Prospective Payment System ("PPS"). See 42 C.F.R. § 484. The PPS is based on a "national prospective 60-day episode payment," a rate based on the average cost of care over a 60-day episode for the patient's diagnostic group. Upon a physician's referral, an HHA is required to make an initial assessment visit and perform a comprehensive assessment encompassing the patient's clinical, functional, and service characteristics. Accordingly, a registered nurse must evaluate the patient's eligibility for Medicare home health care, including homebound status, and must determine the patient's care needs using the Outcome and Assessment Information Set ("OASIS") instrument. The OASIS diagnostic items describe the patient's observable medical condition (clinical), physical capabilities (functional), and expected therapeutic needs (service). Based upon the OASIS information – and in turn upon the expected cost of caring for the patient – the patient's "case mix assignment" is determined and the patient is assigned to one of 153

Home Health Resource Groups ("HHRGs"). The patient's HHRG assignment and other OASIS information are represented by a Health Insurance Prospective Payment System (HIPPS) code that is used by Government Payors to determine the rate of payment to the HHA for a given patient. Consequently, it is a condition material to the Government Payors' decision to pay that all data included in OASIS forms be truthful and accurate.

25.     Once the HHA has submitted the patients has submitted the patient's OASIS information, partial payment is made based on a presumptive 60-day episode. In order to continue receiving covered care for another 60-day episode, the patient must be re-certified by a physician within the final five days of the initial episode as requiring and qualifying for home health care, and a new comprehensive assessment must be performed. The initial base rate may be subject to upward adjustment, such as where there is a "significant change in condition resulting in a new case-mix assignment," or downward adjustment, such as where the number of predicted therapy visits substantially exceeds the number actually performed. Throughout the patient's episode, the HHA is required to maintain clinical notes documenting the patient's condition and the health services performed.

26.     Government expenditures on home health care have risen dramatically in the last decade. According to a report by the Medicare Payment Advisory Commission, HHA, as an industry, currently enjoys an average profit margin of nearly 16%. In light of the explosive growth in profits to private companies and cost to Medicare, abuse of the home health system has been identified by CMS as a major concern. In March, 2009, the Government Accountability Office published a report entitled "Improvements Needed to Address Improper Payments in Home Health." The GAO reported findings that the startling rise in home health spending was caused in part by fraud on the part of HHAs, including upcoding or overstating the

9

severity of a patient's condition and billing for medically unnecessary treatments. Defendants have engaged in this type of fraud as part of this scheme to fraudulently inflate its Medicare billing and defraud the United States and the State of Indiana.

27.     Through a system falsifying and manipulating Medicare and Medicaid-required patient OASIS information. Defendants systematically and fraudulently boost perspective payments.

## ALLEGATIONS

### Defendants Knowingly Submitted, or Caused to be Submitted, Fraudulent Claims to Government Payors in Order to Bill for Falsified and Altered Diagnoses

28.     Government healthcare programs' home health Prospective Payment System ("PPS") is intended to cover the projected cost of patient care. To that end, government healthcare programs require that an HHA registered nurse make an initial visit to each patient and perform a comprehensive assessment using the OASIS instrument. Medicare's prospective payment for that patient is then tied to the type and intensity – and therefore cost – of care that will be required. For example, a patient who is completely bed-bound manifestly requires more care – at greater expense – than a patient who is ambulatory. Similarly, some conditions, such as strokes, may require extensive, costly, physical and occupational therapy, whereas others, such as minor wound care, may require only limited skilled nursing care and instruction.

29.     The admitting HHA nurse is responsible for developing a physician-approved Plan of Care based on the patient's clinical diagnosis and observable characteristics. Federal regulations require that all encoded OASIS data accurately reflect the patient's status at the time of assessment. 42 CFR 484.20(b).

30.     Based upon the OASIS codes reported by the HHA, the patient is placed in one of 153 HHRGs and associated with one of 640 HIPPS codes that are designed to provide the most

accurate payment for each patient. With the goal of fraudulently placing patients in higher-value groups and boosting Medicare payments, Defendants systematically manipulate the PPS by fraudulently altering and manipulating the OASIS data. Such false diagnoses and manipulated OASIS data directly adds revenue to the reimbursement Government Payors pay to Defendants. Thus, government healthcare programs are routinely billed for, and pay for, patient conditions which are exaggerated or, in some instances, entirely fictional.

31.     From the beginning of her employment with Care Connection of Cincinnati in 2006, Relator has reviewed executed OASIS forms and utilized the information provided to complete Plans of Care. CCC uses information on the OASIS forms and Plans of Care to generate a Requested Anticipated Payment ("RAP") form which serves as the basis for billings submitted to Government Payors. In her current position at CCC, Relator is "the last set of eyes" that reviews the Plans of Care before the resulting RAP is produced. The RAPs are submitted to CMS the very next morning while the physician's signature on the Plan of Care is still pending. As shown below, while Relator is aware that the Plans of Care and RAPs contain falsified diagnose and are, therefore, fraudulent, her supervisors have specifically instructed her to not change any of the information contained on either the OASIS forms or Plans of Care.

32.     As alleged in Paragraph 10, Ascension Health and Evolution Health entered a joint venture agreement in September 2014 to provide home health care services. Almost immediately thereafter, in December 2014, Evolution Health directed CCC to outsource all OASIS coding reviews to Fazzi. Fazzi has no contact with any of the patients and is not authorized to manipulate OASIS data. Though her job responsibilities changed as a result of Fazzi's involvement, Relator remains responsible for reviewing OASIS data and completing the

Plans of Care after the field clinician assessed the patient. Consequently, Relator is able to review Fazzi's fraudulent upcoding of OASIS data.

33. Relator immediately realized that, in spite of these restrictions, Fazzi coders were altering OASIS data by enhancing existing diagnosis codes and adding new codes that were not supported by any medical documentation. Additionally, although federal regulations require coding be based upon the status of the patient at the time of the evaluation, Fazzi violates these regulations by using outdated patient history to justify alterations.

34. CCC and Evolution Health's other home health agencies then use the fraudulently altered OASIS data to complete Plans of Care, which as describe above, become the basis of payment by Government Payors to Evolution Health.

35. Relator has personal knowledge of several specific examples of this fraudulent conduct. The following are a representative sample of Medicare/Medicaid patients whose OASIS forms have been altered, and Defendants have billed to the United States.

(a) A CCC registered nurse evaluated Patient A[2] and indicated on the OASIS form that this patient was being treated for a simple leg wound. However, Fazzi altered the diagnosis on the OASIS form to include uncontrolled diabetes, hypertension, diabetic neuropathy and morbid obesity. There was no medical documentation supporting these diagnoses.

(b) A CCC registered nurse evaluated Patient B—a Medicare Advantage patient— and diagnosed her with a leg ulcer. Without any supporting documentation, Fazzi altered the diagnosis to include a malignant cancer of the larynx.

---

[2] Patient specific information has been redacted from this Complaint pursuant to the Health Insurance Portability and Accountability Act. In accordance with federal law, Relator has provided copies of the relevant medical documentation pertaining to each of the patients described in this Complaint to the appropriate government agencies.

(c)     Another CCC Medicare patient—Patient C—is ambulatory and can self-inject insulin.  Nevertheless, Fazzi altered the OASIS forms to indicate that she is non-ambulatory and cannot self-inject insulin.

(d)     Patient D, a CCC post-surgical patient on Medicare, utilizes the assistance of a hand-held walker.  Fazzi upcoded her diagnosis to paraplegia.

(e)     Another CCC patient on Medicaid—Patient E—was treated for a skin lesion, but the diagnosis was fraudulently upcoded to non-ambulatory and diabetic.

36.     CCC knowingly accepted these fraudulently altered forms as described above and created Plans of Care which reflected the alterations.  These Plans of Care became the basis for government payment to CCC.

37.     Relator also believes that, beginning in March 2015, CCC began conducting training sessions with its healthcare workers to teach them how to falsify OASIS data when initially evaluating patients, so as to match Defendant Fazzi's coding methods in order to later justify fraudulent upcoding.  Specifically, during certain zone meetings, CCC is instructing its registered nurses to falsify answers to an OASIS form question pertaining to ambulation (MO1860), by selecting an answer that indicates that the patient cannot walk without the assistance of another person at all times.  CCC is requiring that its nurses choose this answer even if the patients can walk without any assistance at all.  These fraudulent answers result in higher reimbursement amounts from Government Payors.  For example, in April 2015, Relator reviewed a patient evaluation completed by Bobbie Mechley, a home health care registered nurse who evaluated a patient and stated that she needed "someone at all times for ambulation." Relator noted that the patient evaluation did not match this diagnosis, and expressed her concern to Mechley.  Mechley responded via email "I put her down as needing stand by assist [sic]

because in the last zone meeting they recommended that we do this [for] patients getting therapy that aren't using a cane/walker." In addition, Relator's supervisor, Beverly Naber, has distributed written handouts at these zone meetings which explain that Fazzi is using old and outdated evaluations and multiple clinicians' evaluations to justify changing the assessing clinician's OASIS answers.

38. After she discovered Defendants' fraud, Relator immediately expressed her concerns to her supervisor, Beverly Naber, and to Robert James, Evolution Health's Vice President of Midwest Operations. Specifically, Relator sent Naber and James several emails identifying examples of Fazzi's fraudulent upcoding and explaining why it was unlawful. For example, in late April 2015, Relator emailed James advising him that Fazzi had altered an OASIS form to include a diagnosis of pancreatic cancer, even though the patient did not have pancreatic cancer. James did not respond to the email.

39. Additionally, Relator spoke directly with James regarding her concerns that Fazzi was manipulating the OASIS forms. James responded by saying that "we have to use Fazzi. Everybody else is using them and we have to as well." Based on this information, including the fact that Evolution has exercised control over CCC since September 2014 (see, *supra*, ¶9). Relator believes that Evolution Health is using Fazzi system-wide for each of its home health agencies.

40. In late April 2015, Relator directly reported to James that Fazzi was fraudulently diagnosing Medicare patients with fractures that, in some cases, occurred more than twenty (20) years ago. James replied "It is what it is." He then requested Relator to email examples of fraudulent upcoding involving previous fractures. Relator complied with the request, but James never responded.

41.     In addition, Relator has had in-person meetings with both Naber and James where she has explained that Defendants are defrauding government healthcare programs by fraudulently altering patient data.  While Relator's supervisors promised her that they would address her concerns, the fraud has continued.   In spite of being informed that Defendants are violating federal law, both Naber and James instructed Relator to submit the fraudulently altered data to Government Payors for payment.

42.     Upon information and belief, Relator believes these fraudulent diagnoses have resulted in unnecessary procedures being performed on patients, which she believes could compromise the safety of those patients.  Specifically, CMS requires all HHAs to perform "A1c" lab tests on all diabetic patients in order to be eligible for government reimbursement.

43.     Because Defendants are falsely diagnosing patients as being diabetic, patients are now undergoing these A1c lab tests so that CCC can receive reimbursement from Government Payors. For example, Fazzi falsely coded Medicare Patient F as diabetic, even though there is no medical basis for this diagnosis.  As a result, CCC performed the A1c test on her in order to receive the higher reimbursement amount associated with diabetes diagnosis.

44.     Upon information and belief, Evolution Health, through Ascension Health Care, has also enlisted Fazzi to review the Oasis coding for all of its home health agencies.  In March 2015, a representative of four of Evolution Health's Indiana home health care agencies attended a training session at the CCC office where Ms. Owsley is employed.  The purpose of the training was to familiarize the representative with both Fazzi's review methods and how the quality assurance nurses would complete the Plans of Care (based on Fazzi's review) for the Indiana offices.

45.     Additionally, Relator has reviewed documentation establishing that Fazzi is also improperly upcoding OASIS forms for Gem City Home Care.  For example, Patient D, a Gem City Home Care Medicaid patient, received minor surgery to remove a cyst.  Her primary physician specifically noted that the patient does not suffer from diabetes, COPD, apnea, and certain other diseases.  In spite of this notation, Fazzi altered the OASIS form to include, diabetes, sickle-cell anemia, airway obstruction, congestive heart failure, esophageal reflux, apnea, depressive disorder and other conditions which were not supported by any medical documentation.

46.     As a result of this fraudulent scheme, Defendants place the patients in more lucrative HHRGs that do not accurately reflect the type of care or therapy the patient requires.  In so doing, Defendants falsely represent to the United States that it is performing certain care that is prescribed and medically necessary, when in fact it is not.  Consequently, the United States pays for services that are not part of the patient's legitimate plan of care and may in fact be contrary to the patient's true physician-diagnosed condition.

47.     Relator continues to observe fraudulent diagnoses on nearly a daily basis.  OASIS forms are submitted every nine weeks.  Relator estimates that Defendants fraudulently alter nearly half of all OASIS forms.  Relator further estimates that each fraudulently altered OASIS form results in a $3,000 increase.  To date, Relator calculates that for CCC alone has fraudulently billed Government Payors in excess of $2.7 million.

## COUNT I
## VIOLATION OF FEDERAL FALSE CLAIMS ACT, 31 U.S.C. § 3729-33

48.     Relator realleges and incorporates by reference each and every paragraph as though fully set forth herein.

49.     This is a civil action brought by Relator on behalf of the United States against Defendants under the Federal False Claims Act, 31 U.S.C. § 3729-33.

50.     Under the False Claims Act, 31 U.S.C. § 3729(a)(1), as amended on May 20, 2009, Defendants have violated:

i.      31 U.S.C. § 3729(a)(1)(A) by knowingly presenting, or causing to be presented, a false or fraudulent claim for payment or approval; and/or

ii.     31 U.S.C. § 3729(a)(1)(B) by knowingly making, using, or causing to be made or used, a false record or statement material to a false or fraudulent claim.

51.     Government Payors, unaware of the falsity of the claims and/or statements made or caused to be made by Defendants, and in reliance on the accuracy of these claims and/or statements, paid for purported medical services performed for patients insured by federally-funded health insurance programs, including Medicare, Medicaid and CHAMPUS/TRICARE. Had the United States known that the bills presented by Defendants were false and/or fraudulent, payment would not have been made for such claims.

52.     Defendants' unlawful conduct is continuing in nature and has caused the United States to suffer damages.

## COUNT II
## VIOLATION OF THE FEDERAL FALSE CLAIMS ACT, 31 U.S.C. § 3729(a)

53.     Relator realleges and incorporates by reference each and every paragraph as though fully set forth herein.

54.     Through the acts described above, Defendants intentionally and knowingly failed to remit funds paid by Government Payors for services never rendered by Defendants. Defendants knew they had received millions of dollars in home health PPS payments that were fraudulently inflated by false patient OASIS assessment information, yet Defendants took no action to satisfy their obligations to the United States to repay or refund those payments and instead retained the funds and continued to bill the United States.

55.     Under the False Claims Act, 31 U.S.C. § 3729(a), in effect prior to May 20, 2009, Defendants have violated 31 U.S.C. § 3729(a)(7) by knowingly making, using, or causing to be made or used, a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the Government.

56.     Under the False Claims Act, 31 U.S.C. § 3729(a)(1), as amended on May 20, 2009, Defendants have violated 31 U.S.C. § 3729(a)(1)(G) by knowingly making, using, or causing to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly concealing or knowingly and improperly avoiding or decreasing an obligation to pay or transmit money or property to the Government.

57.     Defendants' fraudulent concealment and intentional failure to report funds that were improperly received from Government Payors constitutes an unlawful avoidance of an obligation to pay money owed to the United States.

58.     Defendants' unlawful conduct is continuing in nature and has caused the United States to suffer damages.

## COUNT III
## VIOLATION OF THE INDIANA FALSE CLAIMS AND WHISTLEBLOWER PROTECTION ACT IC 5-11-5.5, *et seq.*

59.     Relator realleges and incorporates by reference each and every of paragraph as though fully set forth herein.

60.     This count sets forth claims for treble damages and forfeitures under the Indiana False Claims and Whistleblower Protection Act.

61.     Through the acts described above, Defendants knowingly cause to be presented to the Indiana Medicaid Program fraudulent claims, records, and statements in order to obtain reimbursement for services not rendered.

62.     Defendants knowingly violated:

i.      IC 5-11-5.5-2(b)(1) by knowingly or intentionally presenting a false claim to the state for payment or approval;

ii.     IC 5-11-5.5-2(b)(2) by knowingly or intentionally making or using a false record or statement to obtain payment or approval of a false claim from the state; and/or

iii.    IC 5-1—5.5-2(b)(6) by knowingly or intentionally making or using a false record or statement to avoid an obligation to pay or transmit property to the state.

63.     Defendants knowingly presented false claims for payment to the State of Indiana. The State of Indiana, unaware of the falsity of these claims, approved, paid and participated in payments made by the State of Indiana Medicaid Program for claims that otherwise would not have been allowed.

64.     Defendants' unlawful conduct is continuing in nature and has caused the State of Indiana to suffer damages.

## PRAYER

WHEREFORE, Cathy Owsley, on behalf of the United States and the State of Indiana, requests:

a.     This Court entered an order determining that Defendants violated the Federal and State False Claims Act by billing Government Payors for services not rendered and unlawfully retaining overpayments;

b.     Defendants pay an amount equal to three times the amount of damages the Unites States and the State of Indiana have sustained because of    Defendants'   actions, plus a civil penalty against Defendants of not less    than $5,500 and not more than $11,000 for each violation of the Federal  and Indiana False Claims Acts;

c.     Defendants cease and desist from violating the Federal and State False     Claims Acts;

d.     Relator be awarded all costs of this action, including attorneys' fees, expenses, and costs pursuant to the Federal and Indiana False Claims Acts;

e.     The United States, the State of Indiana and Relator be granted all such     other relief as the Court deems just and proper.

## PLAINTIFF/RELATOR DEMANDS A TRIAL BY JURY ON ALL COUNTS

DATED: August 4, 2015

Respectfully submitted,

_____
FREDERICK M. MORGAN, Jr. (0027687)
MORGAN VERKAMP, LLC
35 E. 7th Street, Suite 600
Cincinnati, Ohio 45202
Phone: (513)-651-4400
Fax:     (513)-651-4405
rmorgan@morganverkamp.com
*Trial Attorney*

***Elaine Stromgren***
ELAINE STROMGREN
Florida Bar No.: 0417610
estromgren@jameshoyer.com
SEAN P. KEEFE
Florida Bar No.: 0413828
skeefe@jameshoyer.com
JAMES, HOYER NEWCOMER &
 SMILJANICH, P.A.
4830 West Kennedy Boulevard
One Urban Centre, Suite 550
Tampa, Florida 33609
Phone: (813) 397-2300
Fax: (813) 397-2310
*Lead Counsel*