# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA;** | ) | |
| **STATE OF INDIANA;** | ) | |
| ***ex rel.* CATHY OWSLEY,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | **Case No: 15-cv-511** |
| | ) | |
| | ) | **FILED UNDER SEAL** |
| | ) | **PURSUANT TO** |
| | ) | **31 U.S.C. § 3730(b)(2)** |
| **v.** | ) | |
| | ) | |
| **FAZZI ASSOCIATES, INC.;** | ) | |
| **CARE CONNECTION OF CINCINNATI;** | ) | |
| **GEM CITY HOME CARE;** | ) | |
| **ASCENSION HEALTH CARE;** | ) | |
| **ENVISION HEALTHCARE HOLDINGS, INC.** | ) | |
| | ) | |
| **Defendants.** | ) | |
| | ) | |

---

## AMENDED *QUI TAM* COMPLAINT

---

This is an action brought by Plaintiff/Relator Cathy Owsley on behalf of the United States of America pursuant to the False Claims Act, 31 U.S.C. § 3729, *et seq.* (the "FCA"), and the State of Indiana pursuant to the Indiana Medicaid False Claims and Whistleblower Protection Act (the "IMFCWPA"), 5-11-5.7, *et seq* (as amended through P.L. 109-2014). In support thereof, Relator alleges as follows:

1. From at least December 2014 through the present, Fazzi Associates, Inc. and Envision Healthcare Holdings through its partner Ascension Health Care, and through its subsidiaries, Care Connection of Cincinnati, and Gem City Home Care (collectively

"Defendants"), have engaged in a scheme to defraud the United States and the State of Indiana by knowingly submitting and/or causing to be submitted false and/or fraudulent claims, and retaining overpayments from government healthcare programs, including Medicare, Medicaid, and TRICARE.

2. Specifically, Defendants altered or falsified patient assessments to inflate Outcome and Assessment Information Set ("OASIS") scores in order to qualify for higher reimbursement amounts from government healthcare programs. As explained below, OASIS data are used for multiple purposes including calculating several types of quality reports which are provided to home health agencies to help guide quality and performance improvement efforts.

3. Consequently, Defendants knowingly billed, or caused to be billed, government healthcare programs for services which were based on falsified patient assessments and diagnoses. In some cases, falsified patient assessments and diagnoses of diabetes have caused unnecessary procedures to be performed on patients, raising the concern that Defendants' fraudulent conduct is compromising patient safety.

4. The FCA and IMFCWPA provide that any person who knowingly submits or causes to be submitted to the government or recipients of federal funds a false or fraudulent claim for payment or approval is liable for a civil penalty of between $10,781.40 and $21,562.80 for each such claim, and three times the amount of the damages sustained by the government. The FCA permits persons having information regarding a false or fraudulent claim against the government to bring an action on behalf of the government and to share in any recovery. The complaint must be filed under seal, without service on the defendant. The complaint remains

under seal while the government conducts an investigation of the allegations in the complaint and determines whether to join the action.

5.     Pursuant to the FCA and IMFCWPA, Plaintiff/Relator seeks to recover on behalf of the United States and the State of Indiana, damages and civil penalties arising from Defendants' overcharging of Medicare, Medicaid, and CHAMPUS/TRICARE by: (1) falsifying patient assessments and diagnoses to qualify for higher reimbursement rates; (2) billing for services not rendered or medically unnecessary; and (3) retaining known overpayments.

<u>**PARTIES**</u>

6.     Relator Cathy Owsley is a resident of Ft. Thomas, Kentucky.  She was licensed as a registered nurse by the State of Ohio on March 30, 1979 and has been continually licensed since that date.  Ms. Owsley has 17 years of home healthcare experience.  Since 2006, she has worked as a Quality Assurance Nurse for Care Connection of Cincinnati.  She is responsible for reviewing patient assessment forms and completing Plans of Care that are initiated by the assessing clinician and must be signed by a physician.  In addition, in this capacity, she has firsthand knowledge of how Care Connection bills government healthcare programs based on the Plans of Care she reviews.

7.     Defendant Fazzi Associates, Inc. ("Fazzi") is located in Northampton, Massachusetts and specializes in the coding of home care and hospice medical services.  Fazzi holds itself out as the largest outsource coding service in the country.

8.     Defendant Care Connection of Cincinnati ("CCC" or "Care Connection") is a home health agency located in Cincinnati, Ohio.  Its parent company is Evolution Health Care of Dallas, Texas, a division of Defendant Envision Healthcare Holdings, Inc.  CCC has a normal census of 1500 patients, more than 60% of whom are insured by government health care plans.

9.      Defendant Gem City Home Care ("Gem City") is a home health agency with locations in Dayton, Ohio; Columbus, Ohio and Indianapolis, Indiana.  Its parent company is Evolution Health, a division of Defendant Envision Healthcare Holdings, Inc.  Together, CCC and Gem City provide home nursing services in 53 counties in Ohio and Indiana.

10.      Defendant Envision Healthcare Holdings, Inc. ("Envision") was formed in January 2005 as Emergency Medical Services Corporation.  Envision provides a broad range of healthcare solutions, ranging from medical transportation to hospital encounters to comprehensive care alternatives.  Envision issued an initial public offering in late 2005, and on that date, merged with a private equity firm.  In 2012, Envision created a division called Evolution Health, which is a healthcare services provider specializing in post-acute care management of patients with advanced illnesses and chronic disease with annual revenues of $4 billion. Evolution Health is headquartered in Dallas, Texas, with more than 1,100 employees managing a daily census of more than 11,000 patients.  Envision will hereinafter be referred to as "Evolution Health." Evolution Heath has outsourced its home healthcare coding to Defendant Fazzi for all of its home healthcare agencies.

11.      Defendant Ascension Health is a faith-based healthcare organization and is a direct subsidiary of Ascension, the largest non-profit health system in the United States. It is headquartered in Edmundson, Missouri.  In September 2014, Ascension Health and Evolution Health entered a joint venture agreement to provide home health care services.  Pursuant to this agreement, Evolution Health is Ascension Health's "exclusive partner" in the provision of home health care services.  Both parties to the agreement anticipated annual revenues to be between $75 and $100 million.

## JURISDICTION AND VENUE

12.     This action arises under the False Claims Act, 31 U.S.C. §§ 3729-3732, and the Indiana Medicaid False Claims and Whistleblower Protection Act, IC 5-11-5.5.  This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 1345, 28 U.S.C. § 1367 and 31 U.S.C. § 3732(a), which confers jurisdiction on this Court for actions brought under 31 U.S.C. § 3730. Additionally, 31 U.S.C. § 3732(b) confers jurisdiction on this Court for state-law claims that arise under the same transactions or occurrences as the action brought under 31 U.S.C. § 3730.

13.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)-(c) and 31 U.S.C. § 3732(a) because Defendants can be found in, reside in, or have transacted business in the Southern District of Ohio, and many of the alleged acts occurred in this District.

14.     Ms. Owsley is an original source as defined by the False Claims Act in 31 U.S.C. § 3730(e)(4)(B). She has made voluntary disclosures to the United States and the State of Indiana prior to the filing of this lawsuit and this Amended Complaint as required by 31 U.S.C. § 3730(b)(2).

## REGULATORY OVERVIEW

### The Federal and State False Claims Acts

15.     The False Claims Act, as amended by the Fraud Enforcement and Recovery Act of 2009, Pub. L. No. 111-21[1] provides, in relevant part:

**Liability for Certain Acts.** (1) **In General** – Subject to paragraph (2), any person who – (A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval; (B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim; . . . or (G) knowingly makes, uses, or causes to be made or used a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government, is liable to the United States

---

[1] The FCA was further amended on March 23, 2010 by the Patient Protection and Affordable Care Act ("PPACA"), Pub. L. 111-148, 124 Stat. 119. PPACA did not impact the portions of the FCA quoted here.

for a civil penalty of not less than [$5,500] and not more than [$11,000] . . . plus 3 times the amount of damages which the Government sustains because of the act of that person.

31 U.S.C. § 3729(a)(1).

**Actions by Private Persons.** (1) A person may bring a civil action for a violation of section 3729 for the person and for the United States Government. The action shall be brought in the name of the Government.

31 U.S.C. § 3730(b)(1).

16.     Additionally, the State of Indiana has passed False Claims Act legislation which closely mirrors the Federal FCA.  Defendants' acts alleged herein constitute a violation of the Indiana False Claims and Whistleblower Protection Act, IC 5-11-5.7.

17.     Ms. Owsley seeks to recover damages and civil penalties in the name of the United States of America and the State of Indiana arising from the false statements and claims for payment made by Defendants to the United States and the State of Indiana.  Specifically, the false statements and claims involve "upcoding" home health prospective payment data by fraudulently manipulating and altering patient assessments and diagnoses in order to inflate prospective payments.

**Duty to Report and Return Overpayments**

18.     The Medicare and Medicaid program integrity provisions, 42 U.S.C. § 1320a-7k(d), state as follows:

**(d) Reporting and returning of overpayments**

**(1) In general**

If a person has received an overpayment, that person shall--

(A)     Report and return the overpayment to the Secretary, the State, an intermediary, a

carrier, a contractor, as appropriate, at the correct address; and

(B)     Notify the Secretary, State, intermediary, carrier, or contractor to whom the

        overpayment was returned in writing of the reason for the overpayment.

**(2) Deadline for reporting and returning overpayments**

An overpayment must be reported and returned under paragraph (1) by the later of—

(A)     The date which is 60 days after the date on which the overpayment was

        identified; or

(B)      The date any corresponding cost report is due, if applicable.

**(3) Enforcement**

Any overpayment retained by a person after the deadline for reporting and returning the

overpayment under paragraph (2) is an obligation (as defined in section 3729(b)(3) of Title 31)

for purposes of section 3729 of such title.

## GOVERNMENT HEALTHCARE PROGRAMS

19.     The Medicare Program ("Medicare") is a health insurance program administered

by the Government of the United States that is funded by taxpayer revenue. Medicare is directed

by the United States Health and Human Services Department ("HHS"). Medicare was designed

to assist participating states in providing medical services, durable medical equipment and

prescription drugs to persons over 65 years of age and certain others.

20.     The Medicaid Program ("Medicaid") is a health insurance program administered

by state governments and is funded by State and Federal taxpayer revenue.  It is overseen by

HHS.  Medicaid was designed to assist participating states in providing medical services, durable

medical equipment and prescription drugs to financially-needy individuals who qualify for

Medicaid.

21. CHAMPUS/TRICARE is a federally-funded program that provides medical benefits to (a) the spouses and unmarried children of (1) active duty and retired service members and (2) reservists who were ordered to active duty for thirty days or longer; (b) the unmarried spouses and children of deceases service members; and (c) armed forces retirees.

22. Whenever appropriate, Medicare, Medicaid and CHAMPUS/TRICARE will be collectively referred to as "government healthcare programs."

## MEDICARE AND MEDICAID HOME HEALTH COVERAGE

23. Through the Medicare program administered by Center for Medicare and Medicaid Services ("CMS"), the United States provides health insurance to eligible citizens. 42 U.S.C. §§ 1395, et. seq. As part of its coverage, Medicare pays for some "home health services" for qualified patients. In order to qualify for home health care reimbursement under Medicare, a patient must: (1) be homebound – i.e., the patient is generally confined to her home and can leave only with considerable effort; (2) need part-time skilled nursing services or speech therapy, physical therapy, or continuing occupational therapy as determined by a physician; and (3) be under a plan of care ("Plan of Care") established and periodically reviewed by a physician and administered by a qualified home health agency (HHA). 42 U.S.C. 1395(f). When a patient qualifies, government healthcare programs will pay for: (1) part-time skilled nursing care; (2) physical, occupational, or speech therapy; (3) medical social services (counseling); (4) part-time home health aide services; and (5) medical equipment and supplies. *Id.*

24. Upon a physician's referral, an HHA is required to make an initial assessment visit and perform a comprehensive assessment encompassing the patient's clinical, functional, and service characteristics. 42 C.F.R. §484.55. Accordingly, a registered nurse must evaluate the patient's eligibility for Medicare home health care, including homebound status, and must

determine the patient's care needs using the Outcome and Assessment Information Set ("OASIS") instrument. (*Id*.).   OASIS data are collected at the following time points: (1) start of care; (2) resumption of care following inpatient facility stay; (3) recertification within the last five days of each 60-day recertification period; (4) other follow-up during the home health episode of care; (5) transfer to inpatient facility; (6) discharge from home care; and (7) death at home.  All of these assessments, with the exception of transfer to inpatient facility and death at home, require the clinician to have an in-person encounter with the patient during a home visit.

25.     CMS guidance specifically states the comprehensive assessment and OASIS data collection are to be conducted by a registered nurse (RN) or any of the therapists, including physical therapist (PT), speech language pathologist/speech therapist (SLP/ST), or occupational therapist (OT). A licensed practical nurse or licensed vocational nurse (LPN/LVN), physical therapy assistant (PTA), occupational therapy assistant (OTA), medical social worker (MSW), or aide may not complete OASIS assessments.

26.     The OASIS diagnostic items describe the patient's observable medical condition (clinical), physical capabilities (functional), and expected therapeutic needs (service). Because the OASIS data form the basis of the physician-ordered Plan of Care, CMS guidance states "there should be congruency between documentation of findings from the comprehensive assessment and the Plan of Care."

27.     Based upon the OASIS information – and in turn upon the expected cost of caring for the patient – the patient's "case mix assignment" is determined and the patient is assigned to one of 153 Home Health Resource Groups ("HHRGs").  The patient's HHRG assignment and other OASIS information are represented by a Health Insurance Prospective Payment System (HIPPS) code that is used by government healthcare programs to determine the rate of payment

to the HHA for a given patient.  Consequently, the truthfulness and accuracy of all data in the OASIS form is material to the government's decision to pay for home services.

28.     Once the HHA has submitted the patient's OASIS information, partial payment is made based on a presumptive 60-day episode.  In order to continue receiving covered care for another 60-day episode, the patient must be re-certified by a physician within the final five days of the initial episode as requiring and qualifying for home health care, and a new comprehensive assessment must be performed.  The initial base rate may be subject to upward adjustment, such as where there is a "significant change in condition resulting in a new case-mix assignment," or downward adjustment, such as where the number of predicted therapy visits substantially exceeds the number actually performed.   Throughout the patient's episode, the HHA is required to maintain clinical notes documenting the patient's condition and the health services performed.

29.     Government healthcare programs pay for home health care by way of a Prospective Payment System ("PPS").  42 C.F.R. § 484. The PPS is based on a "national prospective 60-day episode payment," a rate based on the average cost of care over a 60-day episode for the patient's diagnostic group. The OASIS assessment data is used for the calculation of the national prospective 60-day episode payment. An HHA must submit to CMS the OASIS data described at § 484.55 (*see* ¶24, above) in order for CMS to administer applicable payment rate methodologies.

30.     Government expenditures on home health care have risen dramatically in the last decade.  According to a report by the Medicare Payment Advisory Commission, HHAs, as an industry, currently enjoy an average profit margin of nearly 16%.  In light of the explosive growth in profits to private companies and cost to Medicare, abuse of the home health system has been identified by CMS as a major concern.   In March, 2009, the Government

Accountability Office published a report entitled "Improvements Needed to Address Improper Payments in Home Health."  The GAO reported findings that the startling rise in home health spending was caused in part by fraud on the part of HHAs, including upcoding or overstating the severity of a patient's condition and billing for medically unnecessary treatments.

## ALLEGATIONS

### Defendants Knowingly Falsified Patient Assessments and Diagnoses in Order to Receive Higher Reimbursement Amounts from Government Healthcare Programs

31.      Government healthcare programs' home health Prospective Payment System is intended to cover the projected cost of patient care.  To that end, government healthcare programs require that an HHA registered nurse make an initial visit to each patient and perform a comprehensive assessment using the OASIS instrument.  Medicare's prospective payment for that patient is then tied to the type and intensity – and therefore cost – of care that will be required.  For example, a patient who is bedridden requires more care – and is reimbursed at higher rates – than a patient who can walk.  Similarly, some conditions, (for example, strokes) may require extensive, costly, physical and occupational therapy, whereas others, such as minor wound care, may require only limited skilled nursing care and instruction.

32.      The admitting HHA nurse is responsible for developing a physician-approved Plan of Care based on the patient's clinical diagnosis and observable characteristics.  All encoded OASIS data must accurately reflect the patient's status at the time of assessment. 42 CFR 484.20(b).  Based on the OASIS codes reported by the HHA, the patient is placed in one of 153 HHRGs and associated with one of 640 HIPPS codes that are designed to provide the most accurate payment for each patient.

33.      With the goal of fraudulently placing patients in higher-value groups and boosting Medicare payments, Defendants systematically manipulate the PPS by altering and manipulating

the OASIS data to falsely represent that the patient is in worse condition that he/she is. These false assessments and manipulated OASIS data directly increase the reimbursement amount government healthcare programs pay to the Defendant home health agencies. Thus, government healthcare programs are routinely billed for, and pay for, patient conditions which are exaggerated or, in some instances, fictitious.

34.     Throughout her employment as Quality Assurance nurse with Care Connection of Cincinnati in 2006, Ms. Owsley has reviewed executed OASIS forms and utilized the information provided to complete Plans of Care. CCC uses information on the OASIS forms and Plans of Care to generate a Requested Anticipated Payment ("RAP") form which serves as the basis for billings submitted to government healthcare programs. In her current position at CCC, Ms. Owsley is "the last set of eyes" that reviews the Plans of Care before the resulting RAP is produced. The RAPs are submitted to CMS the very next morning while the physician's signature on the Plan of Care is still pending. As shown below, while Ms. Owsley is aware that the Plans of Care and RAPs contain altered patient assessments and falsified diagnoses and are, therefore, fraudulent, her supervisors have specifically instructed her to not change any of the information contained on either the OASIS forms or Plans of Care.

35.     As alleged above (*see* ¶10), Ascension Health and Evolution Health entered a joint venture agreement in September 2014 to provide home health care services. In December 2014, Evolution Health directed CCC to outsource all OASIS coding reviews to Fazzi. Fazzi has no contact with any patients and is neither authorized nor legally permitted, to manipulate OASIS data. Though her job responsibilities changed as a result of Fazzi's involvement, Ms. Owsley remains responsible for reviewing OASIS data and completing the Plans of Care after

the field clinician assesses the patient.  Consequently, Ms. Owsley is able to review Fazzi's fraudulent altering of OASIS data.

36.    Ms. Owsley quickly realized that Fazzi coders were altering OASIS data by enhancing existing diagnosis codes and adding new codes that were not supported by any medical documentation.  She additionally observed that, although federal regulations require coding be based upon the status of the patient at the time of the evaluation, Fazzi violates these regulations by using outdated patient history to justify alterations.

37.    CCC and Evolution Health's other home health agencies then use the fraudulently altered OASIS data to complete Plans of Care, which as described above, become the basis of payment by government healthcare programs to Evolution Health.

38.    Ms. Owsley has personal knowledge of several specific examples of this fraudulent conduct.  The following are a representative sample of 2015 Medicare/Medicaid patients whose OASIS forms have been altered, and then billed by Defendants to the United States.

(a)    A CCC registered nurse evaluated Patient A[2] and indicated on the OASIS form that this patient was being treated for a simple leg wound.  However, Fazzi altered the diagnosis on the OASIS form to include uncontrolled diabetes, hypertension, diabetic neuropathy and morbid obesity.  There was no medical documentation supporting these diagnoses.

---

[2] Patient specific information has been redacted from this Complaint pursuant to the Health Insurance Portability and Accountability Act.  In accordance with federal law, Relator has provided copies of the relevant medical documentation pertaining to each of the patients described in this Complaint to the appropriate government agencies.

(b)     A CCC registered nurse evaluated Patient B—a Medicare Advantage patient—and diagnosed her with a leg ulcer. Without any supporting documentation, Fazzi altered the diagnosis to include a malignant cancer of the larynx.

(c)     Another CCC Medicare patient—Patient C—is ambulatory and can self-inject insulin. Nevertheless, Fazzi altered the OASIS forms to indicate that she is non-ambulatory and cannot self-inject insulin.

(d)     Patient D, a CCC post-surgical patient on Medicare, utilizes the assistance of a hand-held walker. Fazzi upcoded her diagnosis to paraplegia.

(e)     Another CCC patient on Medicaid—Patient E—was treated for a skin lesion, but the diagnosis was fraudulently upcoded to non-ambulatory and diabetic.

39.     CCC, with assistance from Fazzi, knowingly altered OASIS forms as described above and created Plans of Care which reflected the falsifications. These Plans of Care became the basis for government payment to CCC.

40.     Beginning in March 2015, CCC began conducting training sessions with its healthcare workers to teach them how to falsify OASIS data when initially evaluating patients, so as to match Defendant Fazzi's coding methods in order to later justify fraudulent upcoding. Specifically, during zone meetings, CCC instructs its registered nurses to falsify answers to an OASIS form question pertaining to ambulation (MO1860), by selecting an answer that indicates that the patient cannot walk without the assistance of another person at all times. CCC requires its nurses choose this answer even if the patients can walk without any assistance at all. These fraudulent answers result in higher reimbursement amounts from government healthcare programs. In addition, Ms. Owsley's (now former) supervisor, Beverly Naber, has distributed written handouts at these zone meetings which confirm that Fazzi is using old and outdated

evaluations and multiple clinicians' evaluations to justify changing the assessing clinician's OASIS answers.

41.     After she discovered Defendants' fraud, Ms. Owsley immediately expressed her concerns to her then-supervisor, Beverly Naber, and to Robert James, Evolution Health's then-Vice President of Midwest Operations.  Specifically, Ms. Owsley sent Naber and James several emails identifying examples of Fazzi's fraudulent upcoding and explaining why it was unlawful. For example, in late April 2015, Ms. Owsley emailed James advising him that Fazzi had altered an OASIS form to falsely represent a diagnosis of pancreatic cancer, even though the patient did not have pancreatic cancer. James did not respond to the email.

42.     In late April 2015, Ms. Owsley directly reported to James that Fazzi was fraudulently diagnosing Medicare patients with fractures that, in some cases, occurred more than 20 years earlier.   James replied "It is what it is."   He then requested Ms. Owsley to email examples of fraudulent upcoding involving previous fractures.  Ms. Owsley complied with the request, but James never responded.

43.     Ms. Owsley has had in-person meetings with both Naber and James where she has explained that Defendants are defrauding government healthcare programs by fraudulently altering patient data.  While Ms. Owsley's supervisors promised her that they would address her concerns, the fraud has continued.   Despite being informed that Defendants are violating federal law, both Naber and James instructed Ms. Owsley to submit the fraudulently altered data to government healthcare programs for payment.

44.     Upon information and belief, Ms. Owsley believes these fraudulent diagnoses have resulted in unnecessary procedures being performed on patients, which she believes could compromise the safety of those patients.  Specifically, in 2015, CMS required all HHAs to

perform "A1C" lab tests on all diabetic patients in order to be eligible for government reimbursement.

45.     Because Defendants falsely diagnosed patients as diabetic, patients unnecessarily underwent the A1C lab test so that CCC could receive reimbursement from Medicare.  For example, Fazzi falsely coded Medicare Patient F as diabetic, even though there is no medical basis for this diagnosis.  As a result, CCC performed the A1C test on her in order to receive the higher reimbursement amount associated with a diabetes diagnosis.

**Defendants Are Altering Patient Assessments to Fraudulently Boost "Star Ratings"**

46.     Defendants have devised a scheme to inflate its "Star Ratings" score to prospective customers who are in the market for home health care.  As noted above, government healthcare programs determine reimbursement amounts based on the need of the patient at the time of assessment.  Accordingly, fraudulently boosted "Star Ratings" scores cause government healthcare programs to reimburse the Defendant home health agencies at higher amounts than is medically necessary or justified.

47.      In order to provide consumers a "convenient source of authoritative information on provider quality," CMS has established the Home Health Compare (HHC) website to assist consumers when choosing a home health care provider.   As part of this outreach, CMS has created a "star ratings" system which will "summarize some of the current measures of health care provider performance[.]"  CMS intends for these star ratings to serve as "an additional tool to support consumers' health care decision-making."

48.     All Medicare-certified HHAs are potentially eligible to receive a Quality of Patient Care Star Rating (hereafter "Star Rating").  The Star Rating is based on OASIS assessments and Medicare claims data and utilizes a methodology that comprises a number of

factors, including several "outcome quality measures." According to CMS, these Outcome Measures include: (1) improvement in ambulation; (2) improvement in bed transferring; (3) improvement in bathing; and (4) improvement in pain interfering with activities.

49. Thus, there are numerous questions on the OASIS assessment which directly affect an HHA's Star Rating. These assessment questions are coded at certain levels, with higher levels (such as "4" or "5") indicating an assessment which requires the most medical attention and assistance and "0" requiring the least.

50. CCC alters patient assessments to falsely inflate its Star Ratings. Beginning in March 2015, CCC began conducting training sessions with its healthcare workers to teach them how to enter OASIS data when initially evaluating patients. As part of this training, CCC requires its registered nurses to watch training videos created by Fazzi, which are made available online through the "Fazzi Academy." One video instructed nurses to answer question M2020 (oral medications) to indicate that patients were unable to take their own medications simply because they were homebound and, therefore, not able to drive themselves to a pharmacy.

51. At a 2015 zone meeting, Beverly Naber instructed registered nurses to falsify answers to an OASIS form question pertaining to ambulation (M1860) by selecting an answer that indicates that the patient cannot walk without the assistance of another person at all times irrespective of whether the answer was accurate. In April 2015, Ms. Owsley reviewed a patient evaluation completed by Bobbie Mechley, a home health care registered nurse who evaluated a patient and stated that she needed "someone at all times for ambulation." Ms. Owsley noted that the patient evaluation did not match this diagnosis, and expressed her concern to Mechley. Mechley responded via email "I put her down as needing stand by assist [sic] because in the last

17

zone meeting they recommended that we do this [for] patients getting therapy that aren't using a cane/walker."

52.     Along with the mandatory training sessions described above, CCC is incentivizing its employees to fraudulently boost its Star Ratings by creating a bonus plan whereby nurses can receive an extra $500 if CCC's Star Ratings improve by the end of the calendar year.  This combination of training videos and incentive plans has resulted in patient assessments being altered on nearly a daily basis.

53.     As part of her quality assurance responsibilities, Ms. Owsley is able to view "audit trails" for each OASIS form.  These audit trails specifically identify which questions relate to Star Ratings by designating them as "star" questions.  In viewing the audit trails, Ms. Owsley is able to see both the original scores for these Star Ratings questions (as recorded by the nurse providing the assessment) and the changes that Fazzi then makes to the scores.  Inevitably, Fazzi's changes always result in a higher score.  Ms. Owsley has observed dozens of patient-specific examples where Fazzi has changed answers to Star Ratings questions after the nurse has completed the patient assessment.

54.     For example, Ms. Owsley reviewed the OASIS audit trail for Patient G. Registered Nurse Rebecca Gumm performed the assessment of this patient on October 8, 2016 and noted that in response to OASIS question M1830 (bathing), the patient was "able to bathe self independently."  Yet, Fazzi Coder Maryia Dabrynets changed this answer to "able to bathe with intermittent assistance of a person."  As a result of this change, the designated value for OASIS question M1830 increased from a "0" to a "2", which indicates the patient is in worse condition than s/he actually is.  Similarly, RN Gumm noted that in response to OASIS question M1860 (ambulation), the same patient was "able to independently walk on even and uneven

surfaces and negotiate stairs with or without railings." However, Fazzi changed this answer to "able to walk only with the supervision or assistance of another person at all times." As a result of this change, the designated score value for OASIS question M1860 increased from a "0" to a "3." Both the M1830 and M1860 questions are designated as "Star" questions on the OASIS audit trail. In total, Fazzi changed answers to eight (8) OASIS questions for this patient.

55.     Ms. Owsley informed her supervisor, Tamela Kunztman, that Fazzi was changing answers to Star Ratings questions for dozens of patients. When Kuntzman asked Ms. Owsley to provide her with an example, she emailed Kuntzman a detailed description of how Fazzi changed the answers for a specific patient. Kuntzman did not reply. When Ms. Owsley later followed up with Kuntzman about her concerns at a meeting, Kuntzman responded "We can report this, but if you don't agree with this you can leave and get another job."

56.     In a November 14, 2016 meeting, Ms. Owsley and Carol Dieckman, a quality assurance nurse, spoke with Sherry Flannery, Director Regional Operations for Evolution Health, about the scheme to boost CCC's Star Ratings. Flannery told them that the Star Ratings assessments must show improvement by the time the patients are discharged. Both Ms. Owsley and Dieckman understood this to mean that the initial assessments must be scored higher than is medically justified so that by the time the patients are discharged, the assessments will indicate the patients had improved while under the care of CCC. As explained below, these fraudulent answers result in higher reimbursement amounts from government healthcare programs.

57.     CCC instructs nurses who perform patient assessments to accept and agree to any changes Fazzi makes to the original answers to OASIS questions. Many of these nurses have shown reluctance to change any answers and have voiced their concerns to their supervisors and to Ms. Owsley. For example, in an email to her supervisors, RN Chasity Cundiff explained that

she is being asked to change answers to questions pertaining to care of a patient's wounds. Cundiff stated in the email that she cannot change the answers as instructed because "it would be false documentation."

58.     Ms. Owsley has observed that most nurses acquiesce to Fazzi's changes out of fear of losing their jobs, while others are too busy to correct Fazzi's changes to match the original patient assessments.  For example, Registered Nurse Jenny Coy, in response to changes Fazzi made to her patient assessment, provided notations in the OASIS documentation where she requested that Ms. Owsley "audit all of my charts" and indicated that "I am not spending anymore of my personal time to change back my answers to the actua[l] and true assessment as I originally documented.  This guy is not any of the answers that Fazzi changed to.  Why do they have to change them?  They should just make recommendations.  Somehow this has to be Medicare fraud."

59.     Another RN, Debra Caylor, was equally blunt when, in response to Fazzi changing her patient assessment, told Fazzi that "we have been instructed to let you all do the coding to ensure proper and accurate codes.  I fill in the physical assessment and I have changed back 1830 and 1860 because it is what I assessed, not because you feel the need to support your codes.  So please ask us to consider changing an[y] response not change the assessment to fit your needs."

60.     Prior to December 2014—when CCC (at Evolution Health's direction) began outsourcing its coding practices to Fazzi—RNs rarely designated a patient with higher OASIS scores for Star Ratings questions.  Ms. Owsley has been observing higher scores for these questions since 2015, and the nurses performing the assessments repeatedly admit that they are now scoring the patients higher because they have been instructed to do by their supervisors.

20

61.     Again, under the prospective payment system ("PPS"), Medicare pays home health agencies a predetermined base payment which is adjusted for the health condition and care needs of the patient.  The adjustment for the health condition, or clinical characteristics, and service needs of the beneficiary is referred to as the case-mix adjustment. The home health PPS will provide HHAs with payments for each 60-day episode of care for each beneficiary.

62.     When CCC and Fazzi alter patient assessments, this generates Plans of Care which are fraudulent because they are based on altered and incorrect assessments.  These Plans of Care result in higher reimbursement amounts from government healthcare programs than are medically and legally justified, since the reimbursement amounts are determined by the needs of the patient at the time of assessment.

## CCC is Fraudulently Billing Government Healthcare Programs for Therapy Services it Never Provided

63.     Government healthcare programs require HHAs to perform periodic reassessments on their patients who are in need of therapy services, such as occupational, speech or physical therapy.  Medicare regulations require that these services only be performed by a licensed therapist.

64.     CCC often contracts with licensed therapists who can perform the required assessments.  In her role as quality assurance nurse, Ms. Owsley has observed patient files which indicate that reassessments have been performed.  However, the patient files indicate that reassessments have been performed by Danielle Reynolds.  Ms. Reynolds is a patient scheduler and not a licensed therapist.

65.     Consequently, Ms. Owsley believes that CCC is fraudulently receiving payment from government healthcare programs for therapy services that were either not performed or were not performed by a licensed therapist as required by Medicare guidelines.

**Evolution Health and Fazzi Are Engaged in a Nationwide Scheme to
Defraud Government Healthcare Programs**

66.     Evolution Health and Fazzi are defrauding government healthcare programs as to

all Evolution Health facilities nationwide. In March 2015, a representative of four of Evolution

Health's Indiana home health care agencies attended a training session at the CCC office where

Ms. Owsley is employed.  The purpose of the training was to familiarize the representative with

both Fazzi's review methods and how the quality assurance nurses would complete the Plans of

Care (based on Fazzi's review) for the Indiana offices. When Ms. Owsley spoke directly with

Evolution Health Vice President Bob James regarding her concerns that Fazzi was altering

OASIS data, James responded by saying that "we have to use Fazzi.  Everybody else is using

them and we have to as well."  In a January 25, 2017 conversation with Brandy Kilmer, one of

Ms. Owsley's supervisors, Kilmer confirmed that Evolution Health has outsourced the coding

practices of each of its home health agencies to Fazzi.

67.     Ms. Owsley has reviewed documentation establishing that Fazzi is improperly

altering OASIS forms for patients at Defendant Gem City Home Care.  For example, Patient H, a

Gem City Home Care Medicaid patient, received minor surgery to remove a cyst.  Her primary

physician specifically noted that the patient does not suffer from diabetes, COPD, apnea, and

certain other diseases.  In spite of this notation, Fazzi altered the OASIS form to include

diabetes, sickle-cell anemia, airway obstruction, congestive heart failure, esophageal reflux,

apnea, depressive disorder and other conditions which were not supported by any medical

documentation.

68.     Based on this information, including the fact that CCC outsourced its coding

practices to Fazzi as soon as Evolution Health took control of CCC in September 2014 (see,

supra, ¶9),  Ms. Owsley  believes that Evolution Health is using Fazzi system-wide for each of

its home health agencies.  According to its website, Evolution Health operates Defendants Care Connections of Cincinnati, Gem City Home Care, and Ascension Health, along with home health care companies Guardian Healthcare and Millennium Home Care.  As such, Evolution Health exercises operational control of dozens of home health agencies across the United States.

69.     As a result of this nationwide fraudulent scheme, Defendants place their patients in more lucrative HHRGs that do not accurately reflect the types of care or therapies the patients require.  In so doing, the Defendant home health agencies falsely represent to the United States that they are performing certain care that is prescribed and medically necessary, when in fact it is not.  Consequently, the United States pays for services that are not part of the patient's legitimate Plan of Care and may in fact be contrary to the patient's true physician-diagnosed condition.

70.     Ms. Owsley continues to observe fraudulent diagnoses almost every day.  OASIS forms are submitted every nine weeks.  Ms. Owsley estimates that Defendants fraudulently alter nearly half of all OASIS forms.  Ms. Owsley further estimates that each fraudulently altered OASIS form results in a $3,000 increase.  To date, Ms. Owsley calculates that CCC alone has fraudulently billed government healthcare programs in excess of $2.7 million.   To her knowledge, Evolution Health has not refunded any payments to government healthcare programs.

## COUNT I
## VIOLATION OF THE FEDERAL FALSE CLAIMS ACT, 31 U.S.C. § 3729(a)(1)(A-B)

71.     Ms. Owsley realleges and incorporates paragraphs 1 through 70 as though fully set forth herein.

72.     This is a civil action brought by Ms. Owsley on behalf of the United States against Defendants under the Federal False Claims Act, 31 U.S.C. § 3729-33.

73.     Under the False Claims Act, 31 U.S.C. § 3729(a)(1), as amended on May 20, 2009, Defendants have violated:

i.      31 U.S.C. § 3729(a)(1)(A) by knowingly presenting, or causing to be presented, a false or fraudulent claim for payment or approval; and/or

ii.     31 U.S.C. § 3729(a)(1)(B) by knowingly making, using, or causing to be made or used, a false record or statement material to a false or fraudulent claim.

74.     Government healthcare programs, unaware of the falsity of the claims and/or statements made or caused to be made by Defendants, and in reliance on the accuracy of these claims and/or statements, paid for purported medical services performed for patients insured by federally-funded health insurance programs, including Medicare, Medicaid and CHAMPUS/TRICARE.  Had the United States known that the bills presented by Defendants were false and/or fraudulent, payment would not have been made for such claims.

75.     Defendants' unlawful conduct is continuing in nature and has caused the United States to suffer damages.

**COUNT II**
**VIOLATION OF THE FEDERAL FALSE CLAIMS ACT, 31 U.S.C. § 3729(a)(1)(G)**

76.     Ms. Owsley realleges and incorporates paragraphs 1 through 70 as though fully set forth herein.

77.     Through the acts described above, Defendants intentionally and knowingly failed to remit funds paid by government healthcare programs for services never rendered by Defendants.  Defendants knew they had received millions of dollars in home health PPS payments that were fraudulently inflated by false patient OASIS assessment information, yet Defendants took no action to satisfy their obligations to the United States to repay or refund those payments and instead retained the funds and continued to bill the United States.

78.     Under the False Claims Act, 31 U.S.C. § 3729(a)(1), as amended on May 20, 2009, Defendants have violated 31 U.S.C. § 3729(a)(1)(G) by knowingly making, using, or causing to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly concealing or knowingly and improperly avoiding or decreasing an obligation to pay or transmit money or property to the Government.

79.     Defendants' fraudulent concealment and intentional failure to report funds that were improperly received from government healthcare programs constitutes an unlawful avoidance of an obligation to pay money owed to the United States.

80.     Defendants' unlawful conduct is continuing in nature and has caused the United States to suffer damages.

## COUNT III
## CONSPIRACY TO VIOLATE THE FEDERAL FALSE CLAIMS ACT,
## 31 U.S.C. § 3729(a)(1)(C)

81.     Ms. Owsley realleges and incorporates paragraphs 1 through 70 as though fully set forth herein.

82.     Under the False Claims Act, 31 U.S.C. § 3729(a)(c), as amended on May 20, 2009, Defendants have violated conspired to commit a violation of subparagraph (A), (B), or (G) by:

i.   by conspiring to knowingly present, or cause to be presented, a false or fraudulent claim for payment or approval; and/or

ii.  by conspiring to knowingly make, use, or cause to be made or  used, a false record or statement material to a false or fraudulent claim.

83.     Government healthcare programs, unaware of the falsity of the claims and/or statements made or caused to be made by Defendants, and in reliance on the accuracy of these claims and/or statements, paid for purported medical services performed for patients insured by federally-funded health insurance programs, including Medicare, Medicaid and CHAMPUS/TRICARE.  Had the United States known that the bills presented by Defendants were false and/or fraudulent, payment would not have been made for such claims.

84.     Defendants' unlawful conduct is continuing in nature and has caused the United States to suffer damages.

## COUNT IV
## VIOLATION OF THE INDIANA MEDICAID FALSE CLAIMS AND WHISTLEBLOWER PROTECTION ACT IC 5-11-5.5, *et seq.*

85.     Ms. Owsley realleges and incorporates paragraph 1 through 70 as though fully set forth herein.

86.     This count sets forth claims for treble damages and forfeitures under the Indiana False Claims and Whistleblower Protection Act.

87.      Through the acts described above, Defendants knowingly cause to be presented to the Indiana Medicaid Program fraudulent claims, records, and statements in order to obtain reimbursement for services not rendered.

88.     Defendants knowingly violated:

i.      IC 5-11-5.7-2(b)(1) by knowingly or intentionally presenting a false claim to the state for payment or approval;

ii.     IC 5-11-5.7-2(b)(2) by knowingly or intentionally making or using a false record or statement to obtain payment or approval of a false claim from the state; and/or

iii.      IC 5-1—5.7-2(b)(6) by knowingly or intentionally making or using a false record or statement to avoid an obligation to pay or transmit property to the state.

89.      Defendants knowingly presented false claims for payment to the State of Indiana. The State of Indiana, unaware of the falsity of these claims, approved, paid and participated in payments made by the State of Indiana Medicaid Program for claims that otherwise would not have been allowed.

90.      Defendants' unlawful conduct is continuing in nature and has caused the State of Indiana to suffer damages.

## **PRAYER**

WHEREFORE, Cathy Owsley, on behalf of the United States and the State of Indiana, requests:

a.      This Court entered an order determining that Defendants violated the Federal and State False Claims Act by billing Government Payors for services not rendered and unlawfully retaining overpayments;

b.      Defendants pay an amount equal to three times the amount of damages the United States and the State of Indiana have sustained because of   Defendants' actions, plus a civil penalty against Defendants of not less than $10,781.40 and not more than $21,562.80 for each violation of the Federal and Indiana False Claims Acts;

c.      Defendants cease and desist from violating the Federal and State False Claims Acts;

d.      Ms. Owsley be awarded all costs of this action, including attorneys' fees, expenses, and costs pursuant to the Federal and Indiana False Claims Acts;

     e.      Ms. Owsley be award a relator's share of any recovery as provided by the Federal and Indiana False Claims Acts; and

     f.      The United States, the State of Indiana and Ms. Owsley be granted all such other relief as the Court deems just and proper.

DATED: March 7, 2017

Respectfully submitted,

FREDERICK M. MORGAN, JR.
Ohio Bar No. 0027687
rmorgan@morganverkamp.com
MORGAN VERKAMP, LLC
35 E. 7th Street, Suite 600
Cincinnati, Ohio 45202
Phone: (513)-651-4400
Fax:    (513)-651-4405

***Elaine Stromgren***
ELAINE STROMGREN
Florida Bar No.: 0417610
estromgren@jameshoyer.com
SEAN P. KEEFE
Florida Bar No.: 0413828
skeefe@jameshoyer.com
JAMES HOYER, P.A.
4830 West Kennedy Boulevard
One Urban Centre, Suite 550
Tampa, Florida 33609
Phone: (813) 397-2300
Fax: (813) 397-2310