**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, *et al.*, | : | Case No. 1:15-cv-511 |
| | : | |
| Plaintiffs, | : | Judge Timothy S. Black |
| | : | |
| vs. | : | |
| | : | |
| FAZZI ASSOCIATES, INC., *et al.*, | : | |
| | : | |
| Defendants. | | |

**ORDER GRANTING THE MOTIONS TO DISMISS**
**OF THE ENVISION DEFENDANTS AND DEFENDANT FAZZI ASSOCIATES**
**(Docs. 42, 44), AND TERMINATING THIS CASE IN THIS COURT**

This civil action is before the Court on Defendants Envision Healthcare Holdings, Inc., Care Connection of Cincinnati, Gem City Home Care, and Ascension Health (collectively, "Envision Defendants")'s motion to dismiss relator's amended complaint (Doc. 42) and the parties' responsive memoranda (Docs. 51, 53). Also before the Court is Defendant Fazzi Associates, Inc. ("Fazzi")'s separately filed motion to dismiss relator's amended complaint (Doc. 44) and the parties' responsive memoranda (Docs. 51, 54).

## I.      BACKGROUND

For purposes of Defendants' motions to dismiss, the Court must: (1) view the complaint in the light most favorable to Plaintiff, and (2) take all well-pleaded factual allegations as true. *Bickerstaff v. Lucarelli*, 830 F.3d 388, 396 (July 21, 2016).

Relator Cathy Owsley filed this *qui tam* lawsuit against the Envision Defendants and Fazzi on behalf of the United States and the State of Indiana pursuant to the False

Claims Act ("FCA"), 31 U.S.C. § 3729, *et seq.* and the Indiana Medicaid False Claims and Whistleblower Protection Act ("Indiana FCA"). (Doc. 15). Owsley, a Quality Assurance Nurse for Care Connection of Cincinnati ("Care Connection"), alleges that Defendants are engaging in a nation-wide "upcoding" scheme, inflating patient data and submitting fraudulent Medicare, Medicaid, and CHAMPUS/TRICARE claims. (*Id.* at 1-2, ¶¶ 6, 68-69).

Care Connection and Gem City Home Care ("Gem City") are both "home-health agencies" and are subsidiaries of Evolution Health Care of Dallas ("Evolution"). (*Id.* at ¶ 8-9). Care Connection is located in Cincinnati, and Gem City has multiple locations in Ohio and Indiana. (*Id.*). Evolution, a division of Defendant Envision Healthcare Holdings, Inc ("Envision"), is a "healthcare services provider specializing in post-acute care management of patients with advanced illnesses and chronic disease." (*Id.* at ¶ 10). A separate, faith-based healthcare organization, Defendant Ascension Health Care, entered into a joint venture agreement with Evolution in September 2014 to provide home-healthcare services. (*Id.* at ¶ 11). Beginning in December 2014, Evolution outsourced its home-healthcare coding to Defendant Fazzi for all of its home-health agencies, including Care Connection and Gem City. (*Id.* at ¶¶ 10, 35, 66, 68).

Home-health agencies, such as Care Connection and Gem City, evaluate whether patients are eligible for Medicare's home-health insurance, including whether the patient is home-bound. 42 C.F.R. § 484.55(a); (*Id.* at ¶ 23). The Medicare insurance may include part-time nursing care, physical and speech therapy, part-time home aide services, and medical equipment and supplies. (Doc. 15 at ¶ 23). The evaluations are

conducted using a data-collection tool called Outcome and Assessment Information Set

("OASIS"), which measures a patient's medical condition, physical capabilities, and

expected therapeutic needs. 42 C.F.R. § 484.55(c)(8); (*Id.* at ¶ 24, 26). Home-health

agencies must submit the OASIS data to the Center for Medicare and Medicaid Services

("CMS") to "administer applicable payment rate methodologies." (Doc. 15 at ¶ 29).

"The encoded OASIS data must accurately reflect the patient's status at the time of

assessment." 42 C.F.R. § 484.45(b); (Doc. 15 at ¶ 32). According to Owsley, Care

Connection's OASIS forms are submitted every nine weeks. (Doc. 15 at ¶ 70).

The OASIS data is used to generate a physician-ordered Plan of Care. (Doc. 15 at

¶ 26). The data is also used to determine a patient's "case mix assignment," which

matches a patient with one of 153 Home Health Resource Groups ("HHRGS"), with each

patient receiving a code "that is used by government healthcare programs to determine

the rate of payment to the [home-health agency] for a given patient." (*Id.* at ¶ 27); *see*

*also* 42 C.F.R. § 412.620(a)(3).

Medicare payments for home-health services are distributed via a "prospective

payment system," with an initial payment made based on an estimated cost of services

rendered during a standard sixty-day "episode of care." (Doc. 15 at ¶ 29). The initial

request is referred to as a "request for anticipated payment" ("RAP"). *See* 42 C.F.R.

§ 484.205(h). At the end of the sixty-day episode, Medicare makes a "residual final

payment." 42 C.F.R. § 484.205(g). "The initial base rate may be subject to upward

adjustment, such as where there is a 'significant change in condition resulting in a new

case-mix assignment,' or downward adjustment, such as where the number of predicted therapy visits substantially exceeds the number actually performed." (Doc. 15 at ¶ 28).

In her position as a Quality Assurance Nurse with Care Connection since 2006, Owsley has reviewed completed OASIS forms and has used the OASIS data to complete Plans of Care. (*Id.* at ¶¶ 6, 34). Care Connection "uses information on the OASIS forms and Plans of Care to generate a[n] [RAP] form which serves as the basis for billings submitted to government health care programs." (*Id.*). Owsley alleges that in the course of her work reviewing OASIS data, she noticed that "Fazzi coders were altering OASIS data by enhancing existing diagnosis codes and adding new codes that were not supported by any medical documentation." (*Id.* at ¶ 36). She also observed that Fazzi was using outdated patient histories to alter the codes. (*Id.*). Owsley alleges that she "is the 'last set of eyes' that reviews the Plans of Care before the resulting RAP is produced." (*Id.* at ¶ 34). She further alleges that "RAPs are submitted to CMS the very next morning while the physician's signature on the Plan of Care is still pending." (*Id.*).

As part of this upcoding scheme, Care Connection has allegedly conducted training sessions with its healthcare workers, instructing them on how to falsify data when evaluating patients so as to match Fazzi's coding methods. (*Id.* at ¶¶ 40, 50). This training involved requiring nurses to watch videos created by Fazzi that are available online through the "Fazzi Academy." (*Id.* at ¶ 50). Representatives from four of Evolution's Indiana offices have also participated in training on Fazzi's coding methods. (*Id.* at ¶ 66).

Owsley raised her concerns regarding Fazzi's apparent upcoding multiple occasions to her then-supervisor, Beverly Naber, and also to Robert James, Evolution's then-Vice President of Midwest Operations. (*Id.* at ¶ 41). This included sending emails identifying examples of fraudulently altered OASIS data. (*Id.*). On one occasion, Owsley confronted James regarding Fazzi's upcoded diagnoses, to which James responded, "it is what it is." (*Id.* at ¶ 42). James also allegedly responded, "everybody else is using [Fazzi] and we have to as well." (*Id.* at ¶ 66). Owsley sent James a follow-up email with examples of fraudulent conduct pursuant to his request, however James did not respond. (*Id.*). Owsley also met in person with Naber and James who, on the one hand, promised to address her concerns, but, on the other hand, "instructed Ms. Owsley to submit the fraudulently altered data to government healthcare programs for payment." (*Id.* at 43).

Owsley provides the following examples of patients whose OASIS forms were allegedly altered "and then billed" to the United States:

> (1) A CCC registered nurse evaluated Patient A and indicated on the OASIS form that this patient was being treated for a simple leg wound. However, Fazzi altered the diagnosis on the OASIS form to include uncontrolled diabetes, hypertension, diabetic neuropathy and morbid obesity. There was no medical documentation supporting these diagnoses.
>
> (2) A CCC registered nurse evaluated Patient B—a Medicare Advantage patient—and diagnosed her with a leg ulcer. Without any supporting documentation, Fazzi altered the diagnosis to include a malignant cancer of the larynx.
>
> (3) Another CCC Medicare patient—Patient C—is ambulatory and can self-inject insulin. Nevertheless, Fazzi altered the OASIS forms to indicate that she is nonambulatory

and cannot self-inject insulin.

(4) Patient D, a CCC post-surgical patient on Medicare, utilizes the assistance of a hand-held walker. Fazzi upcoded her diagnosis to paraplegia.

(5) Another CCC patient on Medicaid—Patient E—was treated for a skin lesion, but the diagnosis was fraudulently upcoded to non-ambulatory and diabetic.

(*Id.* at ¶ 38).

Owsley also provides one example of Fazzi altering the OASIS data of a Gem City Patient. (*Id.* at ¶ 67). More specifically, she alleges that Gem City patient, "Patient H," received minor surgery to remove a cyst, with her primary physician noting that the patient did not suffer from diabetes, COPD, apnea, or other specified diseases. However, Fazzi altered the OASIS form to list several diseases, including diabetes and apnea, "which were not supported by any medical documentation." (*Id.*). Further, Owsley believes the upcoded diagnoses have caused patients to receive unnecessary procedures. For example, patients coded as diabetic by Fazzi without a medical basis, such as "Medicare Patient F," received an A1C lab test unnecessarily. (*Id.* at ¶¶ 44-45). [1]

Owsley explains that the inflation of OASIS data coincides with an effort by the Defendant home-health agencies to inflate their "Star Ratings." (*Id.* ¶¶ 46-62). The Center for Medicare and Medicaid Services operates a website that displays Star Ratings for home-health agencies based on health outcome improvements, such as improvement in ambulation and improvement in pain interfering with activities. (*Id.* at ¶ 48). The Star

---

[1] In her consolidated response brief, Owsley concedes (and abandons) any claims related to the allegations in her first amended complaint based on allegedly improper physical therapy services. (Doc. 51 at 6 n.1).

Ratings serve as "an additional tool to support consumers' health care decision-making." (*Id.* at ¶ 47). The ratings are calculated based on OASIS data and other Medicare claims data. (*Id.*). Care Connection nurses are incentivized to boost the agency's Star Rating, with Care Connection offering a $500 bonus if the rating has improved by the end of the year. (*Id.* at ¶ 52).

When reviewing OASIS data, Owsley is able to see the data before and after Fazzi's coding changes and she has observed changes to the data that specifically affect Care Connection's Star Rating. (*Id.* at ¶¶ 35, 53). Owsley provides examples of Fazzi coders changing eight answers to OASIS questions (that affected the Star Rating) for "Patient G," indicating that Patient G was in a worse condition than originally assessed by a nurse. (*Id.* at ¶ 54).[2]

When Owsley raised the issue of Fazzi changing answers affecting the Star Rating to her supervisor, Tamela Kunztman, Kunztman allegedly responded, "[w]e can report this, but if you don't agree with this you can leave and get another job." (*Id.* at ¶ 55). Further, in a meeting between Owsley, a colleague, and Sherry Flannery, the Director of Regional Operations for Evolution Health, about the Start Ratings scheme, Flannery "told them that the Star Ratings assessments must show improvement by the time the patients are discharged," which Owsley and her colleague took to mean that the patients must be given inflated scores in their initial assessment. (*Id.* at ¶ 56). Owsley also documents several specific examples of nurses voicing their opposition to Fazzi's coding alterations,

---

[2] For example, Owsley states that Nurse Gumm, in her initial assessment, coded Patient G as "able to bathe self independently" – and, thereafter, Fazzi coder, Maryia Dabrynets, changed the answer to "able to bathe with intermittent assistance of a person." (Doc. 15 at ¶ 54).

with one nurse stating, "I am not spending anymore of my personal time to change back my answers to the actua[l] and true assessment as I originally documented. This guy is not any of the answers that Fazzi changed to. Why do they have to change them? They should just make recommendations. Somehow this has to be Medicare fraud." (*Id.* at ¶ 58). Another nurse stated, "we have been instructed to let you all do the coding . . . . I fill in the physical assessment and I have changed back 1830 and 1860 because it is what I assessed . . . . So please ask us to consider changing an[y] response [and] not change the assessment to fit your needs." (*Id.* at ¶ 59).

Based on these allegations, Owsley asserts the following claims: (1) knowingly presenting, or causing to be presented, a false or fraudulent claim for payment or approval in violation of 31 U.S.C. § 3729(a)(1)(A) ("presentment claim"), (2) knowingly making, using, or causing to be made or used, a false record or statement material to a false or fraudulent claim in violation of 31 U.S.C. § 3729(a)(1)(B) ("false record claim"), (3) knowingly making, using, or causing to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly concealing or knowingly and improperly avoiding or decreasing an obligation to pay or transmit money or property to the Government in violation of 31 U.S.C. § 3729(a)(1)(G) ("reverse false claim"), (4) conspiracy to commit a violation of subparagraphs (A), (B), or (G) ("conspiracy claim"), and (5) violation of the Indiana FCA. (*Id.* at ¶¶ 71-90).

Owsley filed her first amended complaint on March 7, 2017. (Doc. 15). The United States declined to intervene on April 6, 2018. (Doc. 22). The Envision

Defendants and Fazzi have each moved to dismiss the first amended complaint in its entirety. (Docs. 42, 44). The motions are fully briefed and ripe for review. For the reasons stated below, the Court will grant Defendants' motions to dismiss and will dismiss Owsley's first amended complaint with prejudice.

## II.    STANDARD OF REVIEW

A motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) operates to test the sufficiency of the complaint and permits dismissal of a complaint for "failure to state a claim upon which relief can be granted." To show grounds for relief, Federal Rule of Civil Procedure 8(a) requires that the complaint contain a "short and plain statement of the claim showing that the pleader is entitled to relief."

Pleadings offering mere "'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'" *Bell Atl. v. Twombly*, 550 U.S. 544, 555 (2007). In fact, in determining a motion to dismiss, "courts 'are not bound to accept as true a legal conclusion couched as a factual allegation[.]'" *Id*. at 555 (citing *Papasan v. Allain*, 478 U.S. 265 (1986)). Further, "[f]actual allegations must be enough to raise a right to relief above the speculative level[.]" *Id.* Accordingly, "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678. A claim is plausible where a "plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* Plausibility "is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* "[W]here the well-pleaded facts do not permit the

court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief,'" and the case shall be dismissed. *Id.* (citing Fed. R. Civ. P. 8(a)(2)).

In addition, claims brought under the FCA are subject to Federal Rule of Civil Procedure 9(b)'s heightened pleading requirement that "a party . . . state with particularity the circumstances constituting fraud." *United States ex rel. Prather v. Brookdale Senior Living Cmtys., Inc.*, 838 F.3d 750, 760 (6th Cir. 2016). Rule 9 should not be read to "reintroduce formalities to pleadings" and operates in conjunction with Rule 8's requirement of a "short and plain statement of the claim." *United States ex rel. Sheldon Kettering Health Network*, 816 F.3d 399, 408 (6th Cir. 2016) (citing *United States ex rel. Bledsoe v. Cmty. Health Sys.*, 501 F.3d 493, 503 (6th Cir. 2007)). The "overarching purpose" of Rule 9(b) is to "ensure that [the] defendant possesses sufficient information to respond to an allegation of fraud." *Id.* (citing *United States ex rel. SNAPP, Inc. v. Ford Motor Co.*, 532 F.3d 496, 504 (6th Cir. 2008)).

At a minimum, a relator must allege the "time, place, and content of the alleged misrepresentation on which the injured party relied." *Bledsoe*, 501 F.3d at 505. "A relator cannot meet this standard without alleging which specific false claims constitute a violation of the FCA." *Id.* "Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." *Chesbrough v. VPA., P.C.*, 655 F.3d 461, 466 (6th Cir. 2011). Like in any other case, "[i]n the *qui tam* context, 'the Court must construe the complaint in the light most favorable to the plaintiff, accept all factual allegations as true, and determine whether the complaint contains enough facts to state a

claim to relief that is plausible on its face.'"  *United States ex rel. Ibanez v. Bristol-Myers Squibb Co.*, 874 F.3d 905, 914 (6th Cir. 2017) (quoting *SNAPP*, 532 F.3d at 502).

## III.    ANALYSIS

As stated above, Relator Owsley asserts presentment and false record claims under 31 U.S.C. §§ 3729(a)(1)(A)-(B) for knowingly presenting, or causing to be presented, a false or fraudulent claim for payment or approval, and for knowingly making, using, or causing to be made or used, a false record . . . material to a false or fraudulent claim, respectively.  (Doc. 15 at ¶¶ 71-75).  Owsley also asserts a "reverse false claim" under § 3729(a)(1)(G), and a conspiracy claim under § 3729(a)(1)(C), as well as claims under the Indiana FCA.  (*Id.* at ¶¶ 76-90).  The Envision Defendants and Fazzi have separately moved to dismiss Owsley's First Amended Complaint, arguing, among other things, that Owsley has failed to plead FCA violations with adequate specificity under Rule 9(b).  (Doc. 41 at 6-17; Doc. 44 at 16-28).

### A. Relator fails to plead presentment under § 3729(a)(1)(A) with particularity

To assert a "presentment claim" under § 3729(a)(1)(A) of the FCA, a realtor must allege with specificity that the defendant "knowingly present[ed], or caus[ed] to be presented, a false of fraudulent claim for payment or approval."  31 U.S.C. § 3729(a)(1)(A).  This "requires proof that the alleged false of fraudulent claim was 'presented' to the government."  *United States ex rel. Marlar v. BWXT Y-12, LLC*, 525 F.3d 439, 445 (6th Cir. 2008).  A heath care provider is not liable under the FCA for mere "disregard of Government regulations or improper internal policies;" rather, liability attaches when "as a result of such acts, the provider knowingly asks the Government to

pay amounts it does not owe." *Prather*, 838 F.3d at 768 (quoting *Sanderson v. HCA—The Healthcare Co.*, 447 F.3d 873, 877 (6th Cir. 2006)); *see also Sanderson*, 447 F.3d at 878 (describing the fraudulent claim as "the *sine qua non* of a False Claims Act violation") (quoting *United States ex rel. Clausen v. Lab. Corp. of Am.*, 290 F.3d 1301, 1311 (11th Cir. 2002)). In other words, a relator must do more than "describe a private scheme in detail" and 'then . . . allege simply . . . that the claims requesting illegal payments must have been submitted, were likely submitted or should have been submitted to the Government." *United States ex rel. Hockenberry v. OhioHealth Corp.*, No. 16-4064, 2017 WL 4315016, at *2 (6th Cir. April 14, 2017) (quoting *Sanderson*, 447 F.3d at 877).

Moreover, "[w]here a relator pleads a complex and far-reaching fraudulent scheme," to meet the pleading requirement of Rule 9(b), she must provide "examples of specific false claims submitted to the government pursuant to that scheme." *Ibanez*, 874 F.3d at 914 (quoting *Prather*, 838 F.3d at 768). "Although the relator does not need to identify *every* false claim submitted for payment, [s]he must identify with specificity 'characteristic examples that are illustrative of the class of all claims covered by the fraudulent scheme.'" *Chesbrough*, 655 F.3d at 470 (quoting *Bledsoe*, 501 F.3d at 511).

The fraudulent scheme alleged in Relator's Second Amended Complaint is far-reaching. Owsley asserts that following a joint venture agreement between Evolution and Ascension in September 2014, Evolution outsourced coding for its home-health agencies, including Care Connection and Gem City to Fazzi. (*Id.* at ¶¶ 10, 11, 35, 66, 68). Based on her observations as a Quality Assurance Nurse for Care Connection, Owsley alleges

that Fazzi systematically "upcoded" patient OASIS data which "serves as the basis for billings submitted to government healthcare programs." (*Id.* at ¶¶ 34, 53). This "nationwide" scheme to over-bill the government allegedly occurred from at least December 2014 up through the present, with Owsley "continu[ing] to observe fraudulent diagnoses almost every day." (*Id.* at ¶¶ 1, 70). Owsley estimates that "nearly half" of all OASIS forms contain fraudulently altered data. (*Id.* at ¶ 70). In light of these extensive allegations, Owsley must provide a representative sample of false claims submitted to the government in order for her complaint to proceed to discovery.

Owsley effectively concedes in her consolidated response brief that she has not directly identified an example of a fraudulent bill that was submitted to the government. Rather than rebut this argument by Defendants, Owsley focuses exclusively on her argument that the Court should apply the "relaxed" *Prather* standard discussed below. In her position at Care Connection, Owsley reviewed OASIS data and Plans of Care, but was not involved in the actual submission of RAPs or "claims" to the government.[3] *See Prather*, 838 F.3d at 766 ("[RAPs] . . . constitute 'claims' for purposes of the False Claims Act . . ." and "are treated similarly to requests for final payment"); *see also id.* at 768 (finding that relator failed to plead submission of a specific RAP despite providing detail regarding the fraudulent scheme and patient documentation for submission of payment to Medicare); (Doc. 15 at ¶ 34). Owsley provides examples of allegedly altered

_____

[3] A "claim" is defined by the FCA as "any request or demand . . . for money . . . that—(i) is presented to an officer, employee, or agent of the United States; or (ii) is made to a contractor . . . or other recipient, if the money . . . is to be spent or used on the Government's behalf or to advance a Government program or interest . . ." 31 U.S.C. § 3729(b)(2)(A).

OASIS data but then states in a conclusory manner that the forms were "billed by Defendants to the United States." (Doc. 15 at ¶ 38). She does not attach or identify a RAP or request for final payment, or otherwise identify an actual claim.

However, Owsley is correct that the Sixth Circuit permits an FCA claim to proceed without the identification of an actual bill or invoice in limited circumstances where the relator demonstrates "a strong inference that specific false claims were submitted for payment" "by pleading specific facts based on her personal billing-related knowledge." *Prather*, 838 F.3d at 773; *see also Ibanez*, 874 F.3d at 915. In *Prather*— the first and only Sixth Circuit case to find the "strong inference" standard met—the relator provided four specific examples of patients, including the approximate dates of the episode of care, an allegation that the RAPs and requests for final payment were submitted (sometimes giving dates of submission for one or both), and the amount of the requested final payment. *Id.* at 769-70. In addition, Prather included an exhibit listing hundreds of patients, including the dates of the treatment episode, the specific home-health provider, and the specific community in which each patient lived. *Id.* at 770. The Sixth Circuit also considered the unique circumstances surrounding the relator's allegations. Prather was hired for the specific purpose of working through a backlog of Medicare claims, and she described her responsibilities as reviewing final claims in anticipation of the billing department's submission of the claims to Medicare. *Id.* Furthermore, Prather received confirmation from the billing department that the final claims she reviewed were submitted. *Id.*

In the instant case, Owsley, employed as Quality Assurance Nurse, reviews OASIS data and is "the last set of eyes" to review Plans of Care "before the resulting RAP is produced."  (Doc. 15 at ¶ 34).  Thus, like Prather, Owsley reviews documentation related to the submission of claims to Medicare; but, unlike Prather, Owsley does not review "final claims" prior to their submission to the billing department.  Owsley states that after her review of the Plans of Care, "the RAP is produced."  (*Id.*).  However, she fails to allege who produces the RAP (*i.e.*, the billing department) and does not allege anywhere in the complaint that she personally reviews or has access to the RAPs—which constitute "claims" under the FCA.  In addition, unlike Prather, Owsley does not allege she is notified when claims related to the documentation she reviews are actually submitted.  Owsley states that RAPs are submitted the morning following her review of the Plans of Care, but she does not provide a factual basis for this allegation, such as communication with billing department employees.  *See Marlar*, 525 F.3d at 446 (rejecting presentment claim where relator alleged "on information and belief" that fraudulent claims were submitted to the government).  Thus, although Owsley alleges "firsthand knowledge of how Care Connection bills government health programs," she has not provided important factual details connecting her role reviewing OASIS data and Plans of Care to the actual submission of claims to Medicare or any other government entity.

Moreover, Owsley's examples of patients whose OASIS data were allegedly altered "and then billed by Defendants to the United States" are significantly less detailed than the examples provided by the relator in *Prather*.  Owsley provides five examples of

Care Connection patients and one example of a Gem City patient whose diagnoses were allegedly "upcoded" by Fazzi. (Doc. 15 at ¶¶ 38, 67). The patients are not identified in any way, such as by initials, and unlike the samples in *Prather*, there are no specified dates of either the episodes of care or the submission of RAPs or final claims for payment. Owsley simply notes a change in diagnosis made by Fazzi, for example "ambulatory and can self-inject insulin" to the opposite, "non-ambulatory and cannot self-inject insulin." (*Id.*). In some, but not all of the examples, Owsley asserts the changes were made "without any supporting documentation." (*Id.*). Owsley also states Fazzi fraudulently coded "Patient F" as diabetic with "no medical basis for this diagnosis," which resulted in Care Connection performing an unnecessary test associated with the diabetes diagnosis. (*Id.* at 45). A further example involving "Patient G," includes the name of the nurse who performed the initial assessment, the date of the assessment, and the name of the Fazzi coder who allegedly fraudulently upcoded Patient G's diagnoses. (*Id.* at 54). However, each of Owsley's examples lack details related to the submission of a claim to Medicare, such as the date the claim was submitted or the amount of the payment requested.

Without details related to the billing process, Owsley has failed to demonstrate a "strong inference" that Defendants submitted claims for payment to the government for the specific, identified patients. *See, e.g.*, *United States ex rel. Holloway v. Heartland Hospice, Inc.*, No. 3:10-cv-1875, 2019 WL 2611077, at *13 (N.D. Ohio June 26, 2019) (finding relator who reviewed claims prior to submission to Medicare failed to demonstrate a "strong inference" that a false claim was actually submitted due to a lack

of detail *related to claims for payment* such as amounts billed or Medicare certification dates). In *United States ex rel. Crockett v. Complete Fitness Rehabilitation, Inc.*, the Sixth Circuit found that a relator who was exposed to allegedly inflated patient coding that formed "the very basis" of Medicare billing, failed to demonstrate a strong inference that a fraudulent claim was submitted, due to a lack of detail related to the billing process. 721 F. App'x 451, 458-59 (6th Cir. 2018). This was despite the fact that the relator provided emails reflecting pressure from her supervisors to upcode patient diagnoses and provide lengthier therapy sessions. *Id.* at 454-55. In *Crockett*, the relator was arguably further removed from the billing process than Owsley, as, in that case, the relator's employer billed a separate company for services it provided, which then prepared and submitted bills to Medicare. *Id.* at 454. Yet, the principle remains: detailed factual allegations regarding internal fraudulent conduct are insufficient to mount an FCA claim.

Although Owsley provides details related to the alleged upcoding scheme, including her brushed-off attempts to alert her supervisors, Fazzi's coding training program, and the correlation between upcoding and the home-health agencies' Star Ratings—these details relate to potential internal fraudulent conduct and do not assist Owsley in demonstrating the submission of a false claim for payment. Accordingly, Owsley has failed to plead with the level of specificity required by Rule 9(b) that a specific claim was submitted to the government.

## B. Relator's remaining FCA and state claims fail

Owsley has similarly failed to adequately plead her false record claim under § 3729(a)(1)(B), reverse false claim under § 3729(a)(1)(G), and conspiracy claim

under § 3729(a)(1)(C).

Section 3729(a)(1)(B) of the FCA holds liable any person who "knowingly makes, uses, or causes to be made or used a false record or statement material to *a false or fraudulent claim*." (emphasis added). Although the Supreme Court in *Allison Engine Co. v. United States ex rel. Sanders*, 553 U.S. 662, 671 (2008), held that "presentation" of a false statement or record to the government is not an element of a false records claim under § 3729(a)(1)(B), the Sixth Circuit has since clarified that this does not "relieve [a relator] of the need to plead a connection between the alleged fraud and *an actual claim made to the government*." [4] *Chesbrough*, 655 F.3d at 472-73 (emphasis added). "The alleged connection must be evident." *Ibanez*, 874 F.3d at 916. For example, in *Ibanez*, the Sixth Circuit found the connection between the allegedly false statement and claim made to the government "too attenuated to establish liability" where the relator failed to plead a false claim either directly or under the *Prather* standard. *Id.* at 915-16. This was even after the realtor proposed amending the complaint to add data showing some claims were submitted to government programs, because the relator failed to tie *those particular claims* to the alleged false statements. *Id.* at 922; *see also Kettering*, 816 F.3d at 407, 411-14 (denying false statement claim where relator failed to sufficiently plead a false claim).

---

[4] Congress amended § 3729(a)(1)(B), formerly codified at § 3729(a)(2), as part of the Fraud Enforcement and Recovery Act, Pub. L. No. 111-21, 123 Stats. 1617 (2009). The change removed the intent requirement in response to *Allison Engine*. Section 3729(a)(2) used to read: "knowingly makes, uses, or causes to be made or used, a false record or statement *to get* a false or fraudulent claim paid or approved by the Government." The amendment removed the phrase "to get" and replaced it with the current materiality requirement. *See Chesbrough*, 655 F.3d at 467 n.2.

Thus, because Owsley has failed to plead a false claim with specificity, it follows that she has not demonstrated a connection between the examples of upcoded data to an actual claim made to the government. As discussed *supra*, although Owsley documents multiple instances of what she considers to upcoding, she does not plead with specificity the existence of a false claim based on the allegedly fraudulent data. Consequently, her false record claim pursuant to § 3729(a)(1)(B) is subject to dismissal.

Without pleading a false claim with specificity, Owsley's "reverse false claim" under § 3729(a)(1)(G), and conspiracy claim under § 3729(a)(1)(C), also fail, as both claims rely on an assumption that false claims were submitted to the government. *Crockett*, 721 F. App'x at 459. A reverse false claim under § 3729(a)(1)(G) imposes liability when a person accepts an overpayment from the government and fails to refund the difference. This section does not expressly require "presentment" of a claim, but it does require either evidence that the defendant knowingly failed to remit an overpayment or "proof that the defendant made a false record or statement at the time the defendant owed to the government an obligation." *Chesbrough*, 655 F.3d at 473. A relator cannot demonstrate this by merely stating "that the defendant is obligated to repay all payments it received." *Id.*

Owsley's first amended complaint alleges that "Defendants knew they had received millions of dollars in home health . . . payments that were fraudulently inflated by false patient OASIS assessment information," yet "took no action to . . . repay or refund those payments . . . ." (Doc. 15 at ¶ 25). Thus, Owsley's theory "requires the assumption that the United States actually received, much less paid, any over-stated bills"

from Defendants. *Crockett*, 721 F. App'x at 459. Owsley has not identified a fraudulent bill to the government, and thus cannot demonstrate a "concrete obligation" owed to the government. Nor does she allege facts demonstrating overpayment. Accordingly, her reverse false claim is insufficiently pleaded. *Id.* (citing *Chesbrough*, 655 F.3d at 473); *see also Ibanez*, 874 F.3d at 917 (finding "[r]elators do not plead facts that show defendants received overpayment, must less that they retained it.").

Owsley's final FCA claim, conspiracy to violate the FCA under § 3729(a)(1)(C), similarly fails. Under § 3729(a)(1)(C), a realtor must allege a "request or demand intended to be paid by the government." *Crockett*, 721 F. App'x at 459. As previously established, Owsley has not shown that Defendants made a claim for payment to the government. It follows that she has not identified a "request or demand" for payment, and as a result, she has not demonstrated this element of an FCA conspiracy claim. *Id.*

In addition, to plead conspiracy under the FCA, a realtor must allege facts showing there was a plan or agreement "to commit a violation of" the FCA. "[I]t is not enough for relators to show there was an agreement that made it *likely* there would be a violation of the FCA; they must show an agreement was made in order to violate the FCA." *Ibanez*, 874 F.3d at 917. Owsley does not identify an agreement to violate the FCA.

The first amended complaint alleges Ascension and Envision entered a joint-venture agreement in September 2014 "to provide home health care services," and Owsley alleges that soon after this agreement, Evolution "directed [Care Connection] to outsource all OASIS coding reviews to Fazzi." (*Id.* at ¶¶ 35, 68). Owsley further states

that she believes that Evolution Health is using Fazzi for each of its home-health agencies.  (*Id.* at ¶ 68).  However, Owsley does not allege that the joint-venture agreement between Evolution Healthcare Holdings and Ascension, nor the contract with Fazzi, was entered into for the purpose of violating the FCA.  Nor do the facts alleged support an inference of such an agreement.  Therefore, Owsley's conspiracy claim, like her other three FCA claims, is insufficiently pleaded.

Finally, Owsley also asserts fraud claims under the Indiana FCA.  (Doc. 15 at ¶¶ 85-90).  Because the Indiana FCA parallels the federal FCA, the analysis addressing the federal FCA claims is "equally applicable" to the state claims.  *United States ex rel. York Howze v. Sleep Ctrs. Fort Wayne, LLC*, No. 1:11-cv-35, 2016 WL 1358457, at *1 n.1 (N.D. Ind. Apr. 6, 2016).  As such, Owsley's claims under the Indiana FCA are also subject to dismissal.

## IV.    DISMISSAL WITH PREJUDICE

Defendants request that the Court dismiss Relator's complaint with prejudice.  Generally, "a district court 'should freely give leave to amend when justice so requires.'" *United States ex rel. Roycroft v. Geo Grp., Inc.*, 722 F. App'x 404, 408 (6th Cir. 2008).  However, "the district court must have before it the substance of the proposed amendment to determine whether 'justice so requires.'"  *Id.*  Moreover, a court need not permit amendment "under . . . circumstances [that] would encourage delay and bad faith."  *Glazer v. Chase Home Fin., LLC*, 704 F.3d 452, 458-59 (6th Cir. 2013).  One such circumstance is "where a party in its response to a defendant's motion to dismiss seeks leave to amend only in the event the Court finds the original complaint deficient."

*United States ex rel. Kustom Prods. v. Hupp & Assocs.*, No. 2:15-cv-3101, 2017 WL 2021512, at *6 (citing *Begala v. PNC Bank, Ohio, Nat'l Ass'n*, 214 F.3d 776, 783 (6th Cir. 2000)).

Owsley previously filed an amended complaint, and in her response brief, Relator seeks a second opportunity to amend the complaint, should the Court find her first amended complaint deficient. (Doc. 51 at 23). Thus, rather than seek leave to amend her complaint in response to Defendants' motions to dismiss, Owsley seeks leave only on the condition that her existing complaint is found to be deficient. The Court is also left to decide whether a second opportunity to amend the complaint is appropriate without the benefit of reviewing a proposed amended complaint. Accordingly, Owsley's request for leave to amend her complaint is denied.

## V. CONCLUSION

Based on the foregoing, Defendants' motions to dismiss (Docs. 42, 44) are **GRANTED**, and Plaintiff's complaint (Doc. 15) is **DISMISSED with prejudice**. The Clerk shall enter judgment accordingly, whereupon this case is **TERMINATED** in this Court.

**IT IS SO ORDERED.**

Date: _____11/18/19_____

Timothy S. Black

United States District Judge